ALLIS-CHALMERS CREDIT CORPORA-
TION, APPELLEE, *v.* HERBOLT,
APPELLANT.

HERBOLT, APPELLANT, *v.* ALLIS-
CHALMERS CORPORATION ET AL.,
APPELLEES.

(Nos. CA83-10-011 and -012—Decided
May 31, 1984.)

*James M. Kelly,* for appellees Allis-Chalmers Credit Corp. and Allis-Chalmers Corp.

*Edward J. Utz,* for appellant Herbolt.

*James D. Hapner,* for appellee Hillsboro Farmers Exchange.

*Per Curiam.* This cause came on to be heard upon appeal from the Court of Common Pleas of Brown County, Ohio.

On March 22, 1977, appellant, Ross Herbolt, ordered a combine from appellee, Hillsboro Farmers Exchange (hereinafter "Hillsboro"), which was manufactured by appellee, Allis-Chalmers Corporation (hereinafter "Allis-Chalmers"). The various blanks on the order form were filled in by him and the form was signed by both Herbolt and a sales representative from Hillsboro.

On April 19, 1977, a contract of purchase was entered by Hillsboro and Herbolt. Herbolt bought an F-2 Gleaner Combine with a 13-foot "grain head" which contained a "floating cutter bar." Herbolt made a down payment of nearly $14,000 and financed the unpaid balance of $23,403. The total cost of the combine, including the finance charge, was $45,417.75. The contract provided that delivery of the combine was to be made as "soon as possible."

In order to secure the amount financed, Herbolt granted Hillsboro a security interest in the combine. Immediately after the contract and security agreement were executed, Hillsboro assigned both to appellee, Allis-Chalmers Credit Corporation (hereinafter "Allis-Chalmers Credit"), which filed a financing statement on April 21, 1977.

On September 5, 1978, Herbolt purchased a "mud hog rear wheel drive system" for the combine from Hillsboro which was manufactured by Mud Hog Drive Systems ("Mud Hog"). The sale of the mud hog system was evidenced by a contract signed by Herbolt and Hillsboro. Again, part of the purchase price was financed and Herbolt granted a security interest in the unit to Hillsboro to secure compliance with the contract. Hillsboro assigned the contract and its security interest in the unit to Allis-Chalmers Credit, which filed a financing statement in September 1977.

The record reveals that since September 30, 1977, Herbolt has had considerable difficulty with various parts of the equipment and that he has met with representatives from Hillsboro, Mud Hog, Allis-Chalmers Credit, and Allis-Chalmers to try to have the equipment repaired.

On April 27, 1981, Allis-Chalmers Credit filed an action for replevin and money against Herbolt. In Count I of its amended complaint, Allis-Chalmers Credit alleged that it was entitled to immediate possession of the combine and grain head by virtue of its being the holder of a contract and a security interest relative to the items which provide that it was entitled to possession upon default, that Herbolt was in default and that Herbolt's refusal to relinquish possession of the equipment had caused Allis-Chalmers Credit $150 in damages. In Count III, Allis-Chalmers Credit made similar allegations with regard to the mud hog system. Herbolt's answer raised several defenses including failure of consideration, breach of warranty, unconscionability, Truth-In-Lending Act violations, and violations of Ohio's Retail Installment Sales Act.

Allis-Chalmers Credit eventually filed a motion for summary judgment on Counts I and III, which the trial court granted in an entry dated September 27, 1980. The court also determined that there was no just cause for delay. Herbolt initiated a timely appeal from this order.

On May 8, 1981, shortly after Allis-Chalmers Credit filed the action discussed above, Herbolt filed a complaint against Allis-Chalmers, the manufacturer of the combine and grain heads, alleging that the items were negligently designed and manufactured. Herbolt amended his complaint to add Hillsboro as a defendant and further alleged the breach of various express and implied

warranties. Herbolt again amended his complaint to include Mud Hog as an additional defendant and similar claims made with regard to the unit which it manufactured.

Hillsboro and Mud Hog filed motions for summary judgment and Allis-Chalmers filed a motion to dismiss. Each alleged that appellant's claims were barred by the operation of R.C. 1302.98[1] (U.C.C. 2-725), which provides for a four-year statute of limitations for bringing an action alleging the breach of a contract for the sale of goods. On September 27, 1983, the trial court ordered that Mud Hog's motion be overruled and that the motions of Hillsboro and Allis-Chalmers be granted, further finding that with regard to the latter two parties there was no just reason for delaying their dismissal. Herbolt thereafter initiated a timely appeal from the court's order in this action.

This court, *sua sponte,* ordered the consolidation of the two appeals on November 4, 1983, and Herbolt now raises four assignments of error, discussed below, with regard to the two cases.

## I
## A

Herbolt's first and fourth assignments of error are essentially restatements of the same argument and will be consolidated for purposes of our discussion. In essence, Herbolt argues that the four-year statute of limitations found in R.C. 1302.98 did not begin to run until

the combine was delivered to him by Hillsboro and that there was evidentiary matter before the court on the motion for summary judgment and the motion to dismiss indicating that delivery occurred in either June or July 1977. Thus, he argues, his complaint, filed on May 8, 1981, was timely.

Allis-Chalmers argues, for the first time on appeal, that the two-year limitation period in R.C. 2305.10[2] should be applied to the cause of action for negligent design and manufacture. However, by admitting the applicability of and relying solely upon the four-year statute of limitations of R.C. 1302.98 in its arguments to the court below, Allis-Chalmers is estopped from denying such and has waived this argument on appeal. See *In re Adoption of McDermitt* (1980), 63 Ohio St. 2d 301 [17 O.O.3d 195]; *AMF, Inc.* v. *Mravec* (1981), 2 Ohio App. 3d 29.

Allis-Chalmers then argues that Herbolt's claim for breach of *implied* warranty must fail because all implied warranties were excluded with an appropriate disclaimer of warranty in the sales contract.

Allis-Chalmers further argues that, though R.C. 1302.98 governs the alleged claim for breach of *express* warranty, that claim is barred for two reasons. First, it argues that April 19, 1977, the date the contract was executed, is the day the limitation period began. Second, Allis-Chalmers asserts that Herbolt failed to put before the court any "credi-

---

[1] R.C. 1302.98 provides in pertinent part:

"(A) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

"(B) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of

delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered."

[2] R.C. 2305.10 provides, in pertinent part, that "[a]n action for * * * injuring personal property shall be brought within two years after the cause thereof arose."

ble evidence" as to when "tender of delivery" occurred for the purpose of applying R.C. 1302.98.

### B

Herbolt and Hillsboro entered a contract for the sale of "goods."[3] Article 2 of the Uniform Commercial Code (R.C. 1302.01 *et seq.*) was developed to outline the law governing "transactions in goods," R.C. 1302.02, and was adopted in Ohio in 1962.

Article 2 has several sections dealing with the various warranties which may exist in contracts for the sale of goods. See, generally, R.C. 1302.25 through 1302.28. These can generally be broken down into two categories: warranties of title and warranties of quality.[4] Warranties of quality include express warranties (R.C. 1302.26), and the implied warranties of merchantability (R.C. 1302.27) and fitness for a particular purpose (R.C. 1302.28). Herbolt has alleged the breach of express warranties and of the implied warranty of merchantability.

Unless it is excluded or modified, a warranty that goods sold are merchantable arises *by operation of law* in every contract for their sale where the seller is a "merchant"[5] who deals in goods of the kind sold. R.C. 1302.27(A). This warranty arises with or without the consent or intent of parties (subject to the disclaimer provisions discussed below). Allis-Chalmers and Hillsboro are both clearly merchants who deal in farm equipment. Thus, unless we can conclude that the implied warranty of merchantability was effectively disclaimed as a matter of law, the question of whether Herbolt's claim for the breach of this implied warranty was timely filed must be considered, contrary to the assertion of Allis-Chalmers on appeal.

R.C. 1302.29[6] (U.C.C. 2-316) details what a merchant must do to effectively disclaim the implied warranty of merchantability from a sales contract.

---

[3] R.C. 1302.01(A)(8), defines "goods," as "* * * all things * * * which are moveable at the time of identification to the contract for sale * * *," with certain exceptions not relevant herein. Clearly, the combine and other equipment involved in this cause qualify as "goods."

[4] For an excellent discussion of warranty law in Ohio, see Squillante, Warranty Sales Law in Ohio (1981), 31 Case W. Res. L. Rev. 211.

[5] The term "merchant" is defined in R.C. 1302.01(A)(5) to be "* * * a person who deals in goods of the kind * * *."

[6] R.C. 1302.29 provides in pertinent part:

"(B) Subject to division (C) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language *must mention merchantability and in case of a writing must be conspicuous,* and to exclude or modify any implied warranty of fitness the exclusion must be by writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that 'There are no warranties which extend beyond the description on the face hereof.'

"(C) Notwithstanding division (B) of this section:

"(1) unless the circumstances indicate otherwise all implied warranties are excluded by expressions like 'as is,' 'with all faults,' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

"(2) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

"(3) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade." (Emphasis added.)

Specifically, to exclude or modify any part of this warranty the disclaiming language "* * * *must mention merchantability * * *" and, if the disclaimer is put in writing, the printed words disclaiming liability must be "conspicuous." (Emphasis added.) R.C. 1302.29(B). It is the former requirement which Allis-Chalmers's disclaimer fails to satisfy.

The warranty made by Allis-Chalmers includes the following language:

"ALLIS-CHALMERS CORPORATION (the Company) warrants new products sold by it to be merchantable and free from defects in workmanship and material at the time of shipment from the Company's factory. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE EXPRESSLY STATED HEREIN."

The word "merchantable" occurs in the *express warranty* but is not found in the disclaiming language. Where the express mandate of the statute requires the inclusion of the word "merchantability" in the language disclaiming that implied warranty, we must conclude, as a matter of law, that the language quoted above does not effectively disclaim the implied warranty of merchantability. See Nordstrom, Handbook of the Law of Sales (1970) 273, Section 88; White & Summers, Handbook of the Law under the Uniform Commercial Code (2 Ed. 1980) 438, Section 12-5 (hereinafter cited as "White & Summers").

This conclusion is further supported by R.C. 1302.29(B) which expressly provides that the implied warranty of *fitness for a particular purpose* may be effectively disclaimed by language very similar to that used by Allis-Chalmers herein, to wit: "There are no warranties which extend beyond the description on the face hereof." This language disclaims *only* the implied warranty of fitness; not the implied warranty of merchantability. R.C. 1302.29(B); see, also, White & Summers, *supra.* Thus, we

must conclude that Herbolt's claim for breach of the implied warranty of merchantability based upon R.C. 1302.27 is not defeated by the disclaimer as a matter of law, as argued by Allis-Chalmers.

Now we must determine when the four-year statute of limitations provided in R.C. 1302.98 began to run.

R.C. 1302.98(A) provides that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." A cause of action for breach of a sales contract accrues "* * * when the breach occurs * * *." R.C. 1302.98(B). When a breach of *warranty* is alleged, as in the case at bar, the breach generally occurs when "* * * tender of delivery is made * * *," unless the warranty "* * * explicitly extends to future performance * * *" of the goods sold, in which case a discovery rule is provided. R.C. 1302.98(B). (See, also, our discussion at Part II, *infra,* as to warranties covering "future performance.")

"Tender of delivery" is a term of art in the U.C.C. "Tender" is defined to require that the seller "* * * put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." R.C. 1302.47(A) (U.C.C. 2-503). Appellant initially argues that there is a question as to whether "conforming goods," or goods in accordance with the contract (R.C. 1302.01[A][12]), were, in fact, delivered. Thus, he concludes, tender did *not* occur and his action was timely filed. We find this argument to be misguided.

"Tender," as used in the statute of limitations relating to an action for breach of a contract for the sale of goods, refers to an offer as if in fulfillment of contractual obligations even though a defect in the goods may exist when measured against the contract. See *Standard Alliance Indus.* v. *Back Clawson Co.* (C.A. 6, 1978), 587 F.2d 813, 819. This interpretation is in ac-

cordance with the Official Comment to the Uniform Commercial Code[7] and with common sense. To require that "conforming goods" be tendered before the statute of limitations begins to run, as appellant argues, would be tantamount to delaying the running indefinitely since a defect at delivery would prevent the start of the limitation period until it was corrected. See *Standard Alliance Indus., supra.* We reject such a construction of the statute.

Next, we note that, though most aspects of a contract for the sale of goods may be negotiated to include, exclude or modify pertinent U.C.C. provisions,[8] the code states that "[t]he obligation of the seller is to transfer and *deliver * * *.*" We emphasize this obvious point as Allis-Chalmers argues strenuously that the statute of limitations began to run in this case on April 19, 1977, the day the contract was executed. However, the contract itself provided that delivery was to be made as "soon as possible," clearly indicating that some further action of the seller was required before the buyer could obtain the equipment.

In an affidavit which appellees admit was timely filed and part of the record when the trial court considered their respective motions for summary judgment and dismissal, Herbolt alleged that the combine was not delivered "* * * until June or July, 1977." While Herbolt filed an untimely affidavit which the trial court quite properly refused to consider, the averment that delivery was not made until June or July 1977, coupled with a contractual duty to deliver, is sufficient to raise a material question of fact as to how delivery was to occur and when it did, in fact, occur. Since Herbolt's complaint against Allis-Chalmers was filed in May 1981, within four years after June 1977, we must conclude that Allis-Chalmers' motion to dismiss based on the statute of limitations was improperly granted.

## C

Herbolt's initial complaint listed Allis-Chalmers as the sole defendant. On June 1, 1981, the complaint was amended to include Hillsboro as a defendant. The record reveals that service of process was never completed on Hillsboro. However, Hillsboro voluntarily submitted to jurisdiction of the court by filing an answer to Herbolt's amended complaint on July 23, 1981. Hillsboro argues that, as to it, the action was not commenced until July 23, 1981, and is barred by the four-year statute of limitations.

Civ. R. 3(A) provides that "[a] civil action is commenced by the filing of a complaint with the court, if service is obtained within one year from such filing." For the purpose of the statute of limitations, this rule determines when an action is commenced where service is timely. If service is *not* obtained within one year after the filing of the complaint against a defendant, the action "commences," for purposes of applying the statute of limitations, on the date ser-

---

[7] Official Comment 1 to U.C.C. 2-503 (R.C. 1302.47) provides, in part:

"* * * The term 'tender' is used in this Chapter in two different senses. In one sense it refers to 'due tender' which contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed. Unless the context unmistakably indicates otherwise this is the meaning of 'tender' in this Chapter and the occasional addition of the word 'due' is only for clarity and emphasis. At other times it is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions *even though there is a defect* when measured against the contract obligation * * *." (Emphasis added.)

[8] See, generally, White & Summers, *supra,* at 7, Section 2.

vice is obtained or the party submits to the court's jurisdiction. See, *e.g., St. Thomas Hospital* v. *Beal* (1981), 2 Ohio App. 3d 132. Thus, as to Hillsboro, the period of limitation began to run on July 23, 1977, the date Hillsboro filed its answer.

However, as we noted above, appellant's affidavit alleged that delivery did not occur until "June or *July,* 1977." (Emphasis added.) The party seeking summary judgment bears the burden of showing that no material factual questions exist and that he is entitled to summary judgment as a matter of law. Civ. R. 56. The allegation that delivery occurred in June or July 1977 is sufficient to create a factual question as to the date of delivery and, since the action as to Hillsboro commenced on July 23, 1981, it cannot be said that Hillsboro is entitled to judgment as a matter of law.

Accordingly, the trial court erroneously granted Hillsboro's motion for summary judgment and Allis-Chalmers' motion to dismiss. Appellant's first and fourth assignments of error are well-taken and sustained.

## II

Herbolt's second assignment of error asserts that the trial court erred in failing to find as a matter of law that the warranty in the contract for the purchase of the equipment was a warranty extending to the "future performance" of the goods. Herbolt argues that such a warranty can be found in the contract and that, as a result, the four-year statute of limitations did not begin to run until he did or should have *discovered* the breach. We disagree.

The contract for the sale of the combine provides that new products sold by Allis-Chalmers are "* * * merchantable and free from defects in workmanship and material at the time of shipment from the Company's [Allis-Chalmers'] factory." If a product fails to conform to this warranty, Allis-Chalmers promises to "* * * repair, or at its option replace

* * *" any such part, except normal maintenance items, provided that the part is returned to the company's factory or to an authorized dealer within twelve months. The following clause is also found:

"THE COMPANY'S LIABILITY, WHETHER IN CONTRACT OR IN TORT, ARISING OUT OF WARRANTIES, REPRESENTATIONS, INSTRUCTIONS OR DEFECTS FROM ANY CAUSE SHALL BE LIMITED EXCLUSIVELY TO REPAIRING AND REPLACING PARTS UNDER THE CONDITIONS AS AFORESAID, AND IN NO EVENT WILL THE COMPANY BE LIABLE FOR CONSEQUENTIAL DAMAGES."

The question of whether the "repair or replace" language is a warranty or a limitation of available remedies is not a new one. See *Standard Alliance Indus., supra,* at 818. In this case, Herbolt insists that Allis-Chalmers "warranted" that it would repair or replace defective parts for one year, and that such "warranty" extends to the future performance of the product. We feel that this analysis is incorrect.

The U.C.C. has distinguished between "remedies" and "warranties" or obligations. R.C. 1302.14 establishes that, in accordance with the agreement, the seller's obligation is to transfer and deliver, while the buyer's obligation is to accept the goods and pay for them. A "remedy" is defined at R.C. 1301.01 (HH) (U.C.C. 1-201[34]) to be "* * * any remedial right to which an aggrieved party is entitled with or without resort to a tribunal." Official Comment 34 to U.C.C. 1-201 provides that remedial rights are "* * * those to which an aggrieved party can resort on his own motion." Professors White and Summers suggest that "[t]ogether, these two definitions suggest that obligations and remedies are counterparts; when the seller fails to do what he is required to do by the contract, i.e., fails to perform

his obligation, the buyer may invoke an appropriate remedy." White & Summers, *supra*, at 482, fn. 236, Section 12-12.

R.C. 1302.29 (U.C.C. 2-316), which generally discusses the modification of *warranties* (obligations), also provides that "[*r*]*emedies* for breach of warranty can be limited in accordance with the provisions of sections 1302.92 and 1302.93 of the Revised Code * * *." (Emphasis added.) R.C. 1302.29(D). R.C. 1302.92 discusses the liquidation or limitation of damages and R.C. 1302.93 relates to the contractual modification or limitation of remedy. R.C. 1302.93 (A)(1) specifically permits the seller to "* * * limit or alter the measure of damages recoverable under * * * [the contract] * * * by limiting the buyer's *remedies* * * * *to repair and replacement* of non-conforming parts * * *." (Emphasis added.)

As noted in *Standard Alliance Indus., supra,* the repair or replace language would appear to meet the definition of an express warranty as it is a "* * * promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain * * *." R.C. 1302.26(A)(1). However, all promises are not warranties. An express warranty is a promise which requires that the "* * * goods shall conform to the affirmation or promise." *Id.* Here, the promise required that the *seller's conduct* conform to the promise, not that the product's performance conform to the promise.

Accordingly, we find that the repair or replace language is not a warranty extending to future performance under R.C. 1302.98, but is a remedy. Contra *Standard Alliance Indus., supra.* Our conclusion conforms not only to our remedy/warranty analysis, but also to the requirements of R.C. 1302.98(B)

that a warranty "explicitly" extend to the future performance of the goods before the discovery rule may be applied.

Thus, the court's refusal to apply the discovery rule found in R.C. 1302.98(B) was proper as that rule only applies to *warranties* extending to the future performance of the goods sold and there was no such warranty in the contract in question.

Appellant's second assignment of error is overruled.

### III

### A

Herbolt's third assignment of error relates to the granting of Allis-Chalmers Credit's motion for summary judgment on two counts of its claims for money and replevin against appellant. Appellant first alleges that summary judgment was improper as there was a question of fact as to whether Allis-Chalmers Credit was a holder in due course of the note assigned to it by Hillsboro. Appellant's sole argument in this regard, based upon evidentiary matter properly before the trial court on the motion,[9] is that "[b]y virtue of the close similarity of the names Allis-Chalmers Corporation and Allis-Chalmers Credit Corporation a question of fact exists as to whether the latter can be classified as a holder in due course."

Clearly, an assignee taking a note with notice of a defense on the part of any person is not a holder in due course. R.C. 1303.31 (U.C.C. 3-302); *Arcanum Natl. Bank* v. *Hessler* (1982), 69 Ohio St. 2d 549 [23 O.O.3d 468], first paragraph of the syllabus. *Arcanum* further held, in the third paragraph of the syllabus, that:

"A transferee does not take an instrument in good faith and is therefore

---

[9] Herbolt also refers to two letters which were not before the court at the time of its determination of the various motions relevant herein. We will not consider those arguments advanced by Herbolt which are based solely on these letters.

not a holder in due course when *there are sufficient facts to indicate* the transferee, by virtue of its unusually close relationship with the transferor, had reason to know or should have known of infirmities in the underlying transaction from which the instrument originated." (Emphasis added.)

The "close-connectedness" doctrine was established in 1967 by the Supreme Court of New Jersey in *Unico* v. *Owen* (1967), 50 N.J. 101, 232 A.2d 405. The rationale of the doctrine is based on the belief that society should encourage the free negotiability of commercial paper by " '* * * removing certain anxieties of one who takes the paper as an *innocent* purchaser * * *' " (emphasis added) and by giving an innocent purchaser holder-in-due-course status. *Arcanum, supra,* at 554. Where the purchaser is not so innocent and knows about or even controls the transaction underlying the note the requirement of good faith may not be met.

The following five factors are indicative of a close connection between the transferee and transferor: (1) the transferee's drafting of the forms used by the transferor; (2) approval and/or establishment of the transferor's procedures by the transferee *(e.g.,* setting the interest rate, approval of a referral sales plan); (3) a direct contact between the transferee and the debtor, such as an independent check on the debtor's credit worthiness by the transferee; (4) heavy financial reliance upon the transferee by the transferor *(e.g.,* the transfer of all or most of the transferor's paper to the transferee); and (5) common or connected ownership or management of the transferor and transferee. *Arcanum, supra,* at 555.

There is no evidence in the record relating to any of these factors. Rather, appellant would have this court adopt a *per se* rule which would do away with holder-in-due-course status on the basis of a similarity in the names of a transferee and transferor. This we decline to do. Since appellant has not presented sufficient evidentiary material to create a question of fact relative to the close-connectedness theory, we find his argument in this regard to be without merit.

B

Herbolt next argues that summary judgment in favor of Allis-Chalmers Credit was improper because a question of fact exists as to whether the Retail Installment Sales Act ("RISA"), R.C. 1317.01 *et seq.,* applies to preclude Allis-Chalmers Credit from exercising the rights usually attendant to holder-in-due-course status. We must reluctantly agree.

RISA was originally established as a method of regulating retail installment sales. In 1973, R.C. 1317.031[10] was added to avoid the harsh consequences which occur when a consumer who experiences difficulties with a product, the purchase of which required him to execute a note, is unable to assert defenses based on breach of warranty against the assignee of the note because of the assignee's holder-in-due-course status. Whether the decision to "* * * tear down one of the pillars of commercial law * * *," White & Summers, *supra,* at 571, Section 14-8, was a wise one from a policy standpoint is not open for debate

---

[10] R.C. 1317.031 reads as follows:

"Exemption from holder in due course doctrine.

"Notwithstanding section 1303.34 of the Revised Code, a buyer who executes a purchase money loan installment note or a retail installment contract in connection with a consumer transaction may assert against any holder, assignee, or transferee of the note or contract, *specifically including any holder in due course,* as defined in section 1303.31 of the Revised Code, of the note or contract any defense that the buyer may assert against the seller that is authorized by this chapter." (Emphasis added.)

in this forum. Rather, we must apply the law to the facts of this case.

R.C. 1317.031 operates to permit a buyer to assert defenses against an assignee who is otherwise a holder-in-due-course only when certain conditions are met. First, there must be a "retail installment sale." Second, the sale must be a "consumer transaction." If there is an unresolved question of fact as to whether RISA applies to the transaction herein, then summary judgment was inappropriate.

A "retail installment sale" includes "* * * every retail sale of specific goods to any person in which the cash price may be paid in installments over a period of time." R.C. 1317.01(A). "Goods" means "* * * all chattels personal * * *," with certain inapposite exceptions. R.C. 1317.01(C). Clearly, the sale of the combine was a retail installment sale.

A "consumer transaction" includes a sale of goods to an individual "* * * for purposes that are primarily personal, family, or household." R.C. 1317.01(P).

The key issue in the cause *sub judice* is whether Herbolt's use of the combine was primarily for personal, family or household purposes. This court has thoroughly reviewed all of the evidentiary matter which was before the trial court on Allis-Chalmers Credit's motion for summary judgment including the affidavits, responses to interrogatories, admissions and pleadings, and it is simply impossible to determine whether Herbolt's use of the combine was for *primarily* personal or *primarily* commercial use.

Of course, the party seeking summary judgment bears the burden of showing that there is "* * * no genuine issue as to any material fact * * *" and that it is entitled to judgment as a matter of law. Civ. R. 56(C). In addition, a party asserting holder-in-due-course status has the burden of establishing that he is entitled to take advantage of the rights attendant to that status. See R.C. 1303.36(C).

In the case at bar, Herbolt was never asked what he did for a living or for what *purposes* the combine was used. The interrogatories propounded by the plaintiff *do* establish that between 1977 and 1983 the combine was used for approximately 1093 hours (an average of 182 hours per year) to harvest between 1850 and 1900 acres, but the *purpose* of the work was neither requested nor exposed.

Perhaps such information appeared obvious to the parties and the court below, but, as an appellate court, we must base our decision *solely* upon what is properly in the record before us and we cannot speculate as to Herbolt's occupation or his purpose for using the combine. The record herein could just as easily support the conclusion that Herbolt was a philanthropist who gave away all that he harvested, or one who consumed all that he grew, as it would the conclusion that Herbolt was a commercial farmer who used the combine primarily for commercial, not personal, purposes.

This case should be contrasted with the situation in *Mid-Wood, Inc.* v. *Digby* (1982), 5 Ohio App. 3d 246. In *Digby,* there was apparently evidence in the record that Digby purchased grain and services from the plaintiff as a "commercial farmer" to be used in his "commercial farming business." *Id.* at 247. The court in *Digby* concluded, quite properly we believe, that R.C. Chapter 1317 did not apply to prevent the plaintiff from utilizing the rights accorded to a holder-in-due-course because a "consumer transaction" was not involved.

The evidentiary matter before the trial court in the case at bar simply gives no hint as to the purposes, commercial or personal, for which the equipment was purchased. Accordingly, as there is an unresolved question of fact as to whether or not a consumer transaction

occurred, we must conclude that summary judgment was erroneously granted to Allis-Chalmers Credit.

Appellant's third assignment of error is, therefore, sustained.

It is the order of this court that the judgment herein appealed from be, and the same hereby is, reversed and the cause is remanded for further proceedings not inconsistent with this decision.

*Judgment reversed.*

HENDRICKSON, P. J., and KOEHLER, J., concur.

JONES, J., concurs in part and dissents in part.

JONES, J., concurring and dissenting. I concur with my colleagues in reversing this case on the first and fourth assignments of error, for the reasons stated, namely that summary judgment was improper because there were questions of fact with respect to the date when the four-year statute of limitations began to run. I also concur that the second assignment of error has no merit.

I dissent with the majority which finds that the third assignment of error is well-taken with respect to the granting of summary judgment to Allis-Chalmers Credit Corporation. I cannot accept the majority's view that the Retail Installment Sales Act (RISA), R.C. Chapter 1317, is applicable to the sale of the farming equipment which is the subject of this action. It defies logic to believe that the sale of a combine for over $45,000 could be a consumer trans-

action as defined in R.C. 1317.01(P) which reads as follows:

" 'Consumer transaction' means a sale, * * * to an individual for purposes that are primarily *personal, family, or household.*" (Emphasis added.)

The majority decision observes that the combine was used for a total of 1,093 hours (182 hours per year) to harvest between 1,850 and 1,900 acres. The majority then concludes, however, that since "Herbolt was never asked what he did for a living or for what *purposes* the combine was used," there was a question of fact as to whether or not the combine was used primarily for commercial uses rather than personal purposes. Clearly one does not pay over $45,000 for a combine and use it in such an extensive manner unless he is involved in commercial farming. Such is readily apparent, and it was totally unnecessary for there to be testimony that appellant was a commercial farmer. There is an old adage which may well be applicable. "If it walks like a duck and quacks like a duck and swims like a duck, it's probably a duck." There was no legitimate question of fact before the trial court with respect to the use of the combine, and the trial court was correct in granting summary judgment to Allis-Chalmers Credit Corporation. As observed in *Mid-Wood, Inc.* v. *Digby* (1982), 5 Ohio App. 3d 246, the legislature did not intend that the Retail Installment Sales Act be applied to the type of commercial business operated by appellant. To hold otherwise would be a gross enlargement of the class of persons and transactions intended by the legislature to have the protection of the Retail Installment Sales Act.