**NATION ENTERPRISES, INC., d/b/a Nation Pizza, Plaintiff,**

**v.**

**ENERSYST, INC., Defendant.**

**No. 88 C 10754.**

United States District Court, N.D. Illinois, E.D.

Feb. 28, 1990.

Francis X. Grossi, J. Scott McMahon, Lynn Urkov Thorpe, Katten, Muchin & Zavis, Chicago, Ill., for plaintiff.

Alan S. Ganz, Marc A. Primack, Rooks, Pitts & Poust, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Nation Enterprises, Inc. ("Nation") has sued Enersyst, Inc. ("Enersyst") for selling Nation two allegedly defective pizza ovens, designated in the five-count Amended Complaint (the "Complaint") as "Oven 1" and "Oven 2":

 1-2. Both Count I (breach of contract) and Count II (breach of warranty) are governed by the Texas Uniform Commercial Code, Tex.Bus. & Com.Code Ann. ch. 2 (Vernon 1987) ("Commercial Code").[1]

 3. Count III is brought under the Texas Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Com.Code Ann. ch. 17 (Vernon 1987) ("Consumer Act").

 4. Count IV asserts common law promissory estoppel.

 5. Nation has voluntarily dismissed Count V (negligent design) in its entirety.

Enersyst now moves for summary judgment on the first four Counts as they relate to Oven 1.[2] For the reasons stated in this memorandum opinion and order, Enersyst's motion is granted as to Count III but is denied as to all other Counts.

## FACTS[3]

Nation is a maker of pizza crusts, while Enersyst is a manufacturer of commercial ovens for the food processing industry. In 1981 Nation's chief executive officer and sole shareholder Marshall Bauer ("Bauer") entered into discussions with Enersyst's President Don Paul Smith ("Smith") looking to Nation's purchase of an Enersyst Jet Sweep Oven Model C–7–39. Enersyst provided Nation with a quotation and offer to sell Oven 1. Bauer penciled in modifications to a few of the quotation's terms and returned the quotation with his signature. On October 26, 1981 Smith added his signature to approve the sale, initialing his acceptance of Bauer's modifications. Both sides agree that the quotation document as modified thus became a binding contract for the sale of Oven 1.

Oven 1 is a 36–foot–long and 3–foot–wide gas fired convection oven with an aluminum exterior and aluminized steel interior. To bake pizza crusts as the Enersyst design envisioned, heated air was to bake both the tops and bottoms of the crusts as they traveled the oven's length on a stainless steel wire conveyor belt. By controlling the oven temperature and the belt

---

**1.** Both the contract for sale of Oven 1 and the Enersyst quotations for Oven 2 say, "This proposal is governed by the laws of the State of Texas," and neither party has questioned the applicability of that state's laws. Under the circumstances this Court treats that as a stipulation to look to Texas law (see *National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985)). As for the Commercial Code, which is of course in force virtually everywhere in this country (in all the states except Louisiana, which has enacted some portions), "Texas law" includes the Official Comments to that Code.

**2.** Enersyst also contends it is entitled to summary judgment as to Nation's further claim arising out of Enersyst's sale to Nation of some allegedly defective coolers. Enersyst is wrong on that collateral issue, for the reason stated in the Appendix.

**3.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Nation (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)).

speed, the operator was supposed to be able to bake the crusts as desired.[4]

Under the contract Enersyst was obligated (1) to deliver Oven 1 to Nation's plant in Chicago "[t]welve weeks from acceptance of purchase order unless delays beyond the control of the Supplier [Enersyst] are encountered" and (2) to assist in the necessary installation, although Nation was to provide labor for the installation process. That division of responsibilities was spelled out in the following provisions:[5]

> PRICE: Enersyst Jet Sweep Oven with 6″ infeed plus 36′8″ of oven and 6″ outfeed .. $75,000. Price includes ~~two-man days of~~ installation [and] start-up assistance, and delivery costs. Additional assistance is available at $250 per day ($375 per day on Saturday, Sunday or holidays) plus living expenses if contiguous to the aforementioned two days. There will be no charge should any extra time for installation or start up be required due to deficiency of the Supplier's employees. Price guaranteed through October 23, 1981. Price may increase at least 1% per month in the future.

> \* \* \* \* \* \*

> PROVISIONS BY PURCHASER: Unload all material into installation site. Labor to uncrate and install equipment. . . .

In addition, the contract provided a period after delivery in which Nation could test the equipment:

> EXAMINATION AND TESTING:

> Within sixty (60) days after delivery, purchaser shall accept the equipment. If any change is believed required to make the equipment acceptable, the supplier shall be notified as soon as possible in writing and within thirty (30) days after delivery and shall make agreed upon changes before payment. If delay in correcting such changes is for causes beyond the control of the Supplier, [but in fact due through delays caused by the buyer, only,] the balance [of] payment will be made sixty (60) days after delivery or notification of availability for delivery.

Finally, the contract provided the following warranty:

> Seller warrants the equipment manufactured by Seller, and not by others, to be free from defects in workmanship and material under normal use and service for a period of one (1) year from date of delivery or the period of twenty-one hundred (2100) accumulated hours of use, whichever period is shorter. . . .

If things had proceeded as initially intended, delivery would have been made in January 1982. At the time, however, Nation was enlarging its plant and remodeling a new building to house its pizza crust ovens. Accordingly, although Oven 1 was ready for delivery on January 15, 1982, Nation made numerous requests that delivery be delayed to enable it to complete alterations to the new building. According to a letter from Enersyst to Bauer, Bauer asked for one such delay (until April 15, 1982) both to enable Enersyst to incorporate into Oven 1 design changes that had been requested by Nation and because Nation's new building was still not ready.[6] Enersyst finally made shipment on or about September 13, 1982.

But even after that shipment Nation's new building was still not sufficiently complete for Oven 1 to be installed. Although

---

4. As with most contracts for the sale of machinery, the contract specifically disclaimed any guaranty of the quality of Nation's end product:
 Seller does not guarantee the process of manufacture by Purchaser or the quality of product to be produced by the equipment supplied hereunder. . . .

5. Throughout this opinion's quotations of the contractual language, Bauer's deletions are indicated by overstrike and his penciled-in additions are enclosed in brackets.

6. Interestingly, Nation's General Rule 12(m) Response to Enersyst's General Rule 12(l) State-

ment of Facts challenges Enersyst's suggestion that part of the delay may have been caused by Nation-requested design modifications—Nation denies that Bauer ever testified to the effect that changes were made to Oven 1. That dispute might require resolution if the current motion required this Court to determine when Enersyst was ready to deliver Oven 1 as ultimately designed. It is, however, of no consequence to the issue whether the statute of limitations has run out: Both the statute and the warranty are keyed to the date of actual delivery, not the date on which delivery was tendered.

neither party explains fully the reasons for that additional delay,[7] it appears that the installation by Enersyst employees was not complete for nearly two years. According to the deposition of Enersyst engineer Jerald High ("High"), Oven 1 was finally assembled and ready for its first test run on July 18, 1984.[8] That first test was aborted before product could be run through the oven because the oven overheated and the conveyor belt snagged. High modified the conveyor system to prevent snagging in the area where the conveyor belt left the oven, and another test was run the next day (July 19). During the course of that testing further design changes were required and made to deal with the problems that the novel use of aluminum as the oven material had caused to the planned conveyor operation. High's testimony does not reveal the extent of testing done on that day, nor precisely who was in attendance, but a handwritten note he made on July 20 said:

> Cooking tests were run Thursday evening [July 19] and the oven performed satisfactorily except that the conveyor setting needs adjustment to improve tracking and Walter (maintenance man) was to do that Friday morning.

Nation began pizza crust production with Oven 1 on November 6, 1984.

None of the modifications made or suggested by High during the July 18 and 19 tests eliminated all the oven's problems.[9] On November 9, 1984 Nation reported numerous problems—all of which Enersyst considered typical for a new design—to Enersyst. Nation first recorded down-time on Oven 1 on December 26, 1984, and on January 4, 1985 it sent another letter to Enersyst relating more problems. Meanwhile Enersyst was advising Nation on getting the oven up to speed: Smith went to Nation's plant on March 1, 1985 to help, and High did the same on August 23, 1985. In spite of the problems, Oven 1 had logged 2100 hours of use by April 24, 1985.

In August 1985 Bauer asked Enersyst about purchasing a second oven to work in conjunction with Oven 1.[10] According to Nation, Smith made an oral promise that Enersyst would repair Oven 1 as a precondition to Nation's purchase of Oven 2, and on August 20, 1986 he sent Nation a signed letter offering for sale several ovens of varying capabilities and quoting prices. On October 31, 1986 Smith signed and sent to Nation a revised quotation offering to sell an oven with Oven 2's specifications. Neither quotation—nor any other document—reflected Smith's claimed oral promise to repair Oven 1. Rather than simply returning the quotation letter with Bauer's signature on the line marked "accepted" (as it had done when ordering Oven 1), Nation returned a purchase order signed "B. Kraut" and dated November 24, 1986 describing Nation's requirements in terms identical to the description in Enersyst's October 31 revised quotation. About April 6, 1987 Enersyst shipped Oven 2 to Nation's plant. As with Oven 1, Nation complains of numerous defects in Oven 2,

7. Nation's statement of additional facts tries to cast at least some of the onus for the installation delays back on Enersyst. Nation claims it purchased from Enersyst (by purchase order executed September 2, 1983) certain coolers that were installed in about March 1984. Nation claims those coolers failed to perform as promised and had to be returned to Enersyst for redesign. P. Additional Fact No. 10 seems to imply that installation of Oven 1 had to await redesign of the coolers:

> Nation could not use its new facility until the coolers were remodeled and replaced.

But the deposition testimony on which Nation bases that statement (Bauer Dep. 130) refers to delays in *production*, not in installation, and there is no evidence one way or the other on whether Oven 1 could have been installed before the redesigned coolers.

8. Although the Complaint says Nation first made a test run of Oven 1 in November 1984, its own statement of additional facts attached to its General Rule 12(m) Response acknowledges High's July 18 and 19 tests.

9. Indeed, Nation's Additional Fact No. 29 adopts as true the statement of High Dep. 97 that it would be unusual for a complicated, custom-designed conveyor pizza line such as this to experience trouble-free operation in the first several months after construction and installation.

10. It is not clear from the parties' submissions precisely how the two ovens were to work together or why Nation deemed the second oven necessary, but it appears that Oven 2 abutted Oven 1 and pizza crusts passed through both ovens during the cooking process. Nation asserts two reasons for wanting a second oven: (1) to make up for deficiencies in the ability of Oven 1 to cook crusts adequately and (2) to add capacity for more crusts.

but none of those is implicated by the present summary judgment motion.

## BREACH OF CONTRACT AND WARRANTY CLAIMS

Complaint Count I claims damages sustained as a result of Enersyst's breaches of its agreements to sell Ovens 1 and 2. Count II also requests damages for breach of warranty. Enersyst moves on two grounds for summary judgment on both counts as they relate to Oven 1:

 1. Nation's claims as to Oven 1 are assertedly barred by Commercial Code § 2.725, its statute of limitations.[11]

 2. By its express terms the contract is said to negate any express or implied warranties as to Oven 1.

This opinion will treat with each contention in turn.

### 1. *Statute of Limitations.*

■ Both parties agree that Section 2.725 provides the limitations period for contracts for the sale of goods under Texas law:

(a) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(b) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

For present purposes the critical question is when Nation's cause of action accrued under Section 2.725(b). On that score, both parties rely heavily on the Texas Supreme Court's reading of that provision in *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544 (Tex.1986). In that case leaks had developed in a roof built for Safeway in 1970, and Safeway brought suit under the Commercial Code against the supplier of the roofing material, charging breach of express and implied warranties. According to Certainteed's advertisements, the roofing material provided was "bondable up to 20 years" (*id.* at 545). Although the first leaks occurred in 1977, Safeway did not bring suit until 1979. Safeway argued that Section 2.725 did not bar its claims for express or implied warranties because Certainteed's 20–year warranty explicitly extended to future performance, so that Safeway's cause of action assertedly accrued (and the limitations period began to run) when the leaks first became known to Safeway.

First the Texas Supreme Court held (710 S.W.2d at 547–48) that limitations barred the implied warranty claims because "an implied warranty cannot be explicitly extended to future performance." As for Safeway's express warranty claims, on the other hand, the court agreed with Safeway's reading of the statute and remanded to the trial court to determine whether the "bondable up to 20 years" language constituted an express warranty explicitly extending to future performance. Such a determination is easy in the present case, for it is clear that the contract here did indeed contain an express warranty that extended to future performance: By its terms the contract warranted Oven 1 against defects for one year from the date of delivery or 2100 accumulated hours of use, whichever expired sooner.

■ As Enersyst sees things, the four-year limitations period on Nation's Count I and II claims began to run on September 13, 1983—one year after Enersyst shipped the oven to Nation[12]—and had therefore

---

**11.** Because both the Commercial Code and the Consumer Act are codified in the Texas Business and Commercial Code Annotated, further citations to those statutes will simply take the form "Section—" (for simplicity's sake, the term "Subsection" will not be employed even though that might be technically correct).

**12.** Enersyst correctly argues that the warranty expires on the *earlier* of (1) one year after delivery (September 13, 1983 on Enersyst's reckoning) and (2) the date on which Oven 1 accumu-

expired before suit was brought. Nation's attempt to avoid that conclusion proceeds in four steps:

1. "Delivery" as used in the contract really meant "installation," so the warranty period did not begin to run until July 19, 1984 (when installation had progressed to the point where cooking tests could be run in the oven).

2. That gave Nation until the earlier of July 19, 1985 or April 24, 1985 to discover a breach of warranty (see n. 12).

3. Discovery of the breach thus actually occurred in the warranty period—when Nation first recorded down-time on Oven 1 on December 26, 1984.

4. That discovery date is within four years of Nation's filing suit on November 15, 1988.

Whether Nation's argument stands or falls is wholly dependent on its success in making the first step—a showing that when the parties wrote "delivery" in the warranty clause they really meant "installation." None of the arguments for Nation's tortured reading, however, is persuasive.

First Nation points out that the parties agreed to modify the contract's price clause to eliminate a two-day limitation on Enersyst's installation and start-up assistance. From that Nation concludes (D.Mem. 6):

> If Enersyst intended to wash its hands of any obligations upon delivery of the equipment, it would not have included these terms in its contract; nor would it have provided start-up assistance.

But that misses the point. No one has argued that Enersyst wanted to "wash its hands of any obligations" immediately upon delivery. What Enersyst has rather argued is that the parties' bargain gave Nation one year from delivery in which to complain and that Nation's failure to complain in that time started Nation's limitations clock ticking. No inference from the deletion of the two-day limitation on installation assistance could possibly lead this Court to flout that plain meaning of the words actually used in the warranty. That is particularly true in this case, where the parties clearly demonstrated their ability to use the word "installation" where that was meant, but nevertheless chose "delivery" as the touchstone of the warranty provision.[13]

Nation also seeks to rely heavily on *Austin Co. v. Vaughn Building Corp.*, 643 S.W.2d 113 (Tex.1982). First Nation cites *Austin, id.* at 115 (quoting *Republic National Bank of Dallas v. Northwest National Bank of Ft. Worth*, 578 S.W.2d 109, 115 (Tex.1978)) in urging this Court to substitute the word "installation" for "delivery" in the warranty provision by:

> [a]pplying the rule that "a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties." ...

Defendant in *Austin* warranted the roof it built for plaintiff for one year, but it failed to specify that plaintiff also had to notify defendant of any problems with the roof within that same one-year period to compel defendant to honor the warranty.[14] Although leaks developed in the roof within that one-year period,[15] plaintiff first notified defendant of the leaks one year and

---

lated 2100 hours of use (April 24, 1985 on anyone's reckoning).

**13.** In numerous places the rights and obligations of the parties are apportioned by the contract in such a way as to suggest that the use of specific words was deliberate. Some provisions refer to "delivery," some to "installation" and some to the oven's first successful "operation." One example is the clause on payment terms (again reflecting a modification by Bauer):

> Terms: 10% due with order, 65% payable on delivery of the oven, balance is due within sixty (60) days after the first demonstration of operation of the oven or within sixty (60) days

after notification of availability of the oven for delivery if delivery is delayed for reasons ~~beyond the control of the Supplier, whichever comes first~~ [of the buyer].

**14.** Austin's warranty stated:

> Austin guarantees the work against defective workmanship and material for one year from the date of completion of the work as follows: Upon written notice of any such defects, Austin will either make necessary repairs or at its option request Owner to make such repairs, all at Austin's expense.

**15.** Given *Safeway* and *Austin*, one begins to wonder what it is about the Texas climate that is

eleven days after completion. On those facts the court (1) read the contract against its drafter—defendant—to allow plaintiff a "reasonable time" after the expiration of the warranty period within which to notify defendant of leaks and (2) further determined that notice within eleven days was reasonable.

Nation can draw cold comfort from *Austin*. What has just been said as to *Austin*'s facts should show instead why this Court is unwilling to telescope delivery, installation and testing into the single term "delivery," as Nation would urge on the strength of *Austin*. In that case the drafters were silent on the timing of the required notice. Here, by contrast, the issue Nation raises—"delivery" versus "installation"—was squarely addressed and resolved in the contract.[16]

Although this Court is therefore not convinced that "delivery" should be transmuted into "installation," it does not follow that summary judgment is appropriate on Counts I and II. Enersyst takes the Gertrude–Stein–like position that "delivery is delivery is delivery" and that such delivery occurred when Enersyst shipped Oven 1 to Nation's plant in Chicago on September 13, 1982. But that contention involves its own transformation of language: It substitutes a different word that the parties did not use ("shipment") for the one they did ("delivery").

Only a moment's reflection is needed to see that it is far from certain that Enersyst must be said to have effected "delivery" as contemplated by the warranty by simply shipping the oven to an empty building and letting it sit there (rather than in Enersyst's own warehouse) in cartons. Two undisputed circumstances support the con-

clusion that more may have been required. First, Oven 1 was not the kind of appliance anyone can simply run out to the store and purchase: It was a one-of-a-kind unit custom-designed to meet Nation's unique cooking requirements. That oven design was thus entirely untested. Second, when Enersyst was finally able to install the unit in Nation's plant and turn it on, it immediately became apparent that numerous aspects of the Enersyst design were flawed. Enersyst's engineer High made several modifications at that time, including the replacement of part of the oven's aluminum skin with a steel cap to prevent buckling from the heat.[17]

Although both parties refer to the onsite modifications to Oven 1 as repairs, at least in part they were more in the nature of design modifications. Enersyst admits that such modifications are usually necessary to bring such custom-designed ovens to specification. That being true, when Enersyst loaded the cartons containing Oven 1 onto a truck for shipment to Nation's warehouse (or when the truck was unloaded at the warehouse) Enersyst may not have "delivered" an oven at all. It is certainly plausible to think of that event as the delivery of the materials with which to fashion an oven—such later fashioning ("delivery" in the contract sense) to take place in Nation's plant. Just so, a housebuilder who has contracted to construct a dwelling on the buyer's property has not delivered a house as soon as he has a truck unload a pile of lumber onto the property. Viewing the facts in that light at a minimum raises an issue of fact whether "delivery" as used in the warranty required more than the mere shipment of the untested experimental oven to Nation's place of business.[18]

so hard on roofs—or what it is about the work of Texas roofers.

**16.** On the statute of limitations question itself, Nation additionally notes that *Austin* found that the warranty in that case was breached not when the defective roof was built, but when defendant first refused to repair the roof at its own expense as the warranty promised (643 S.W.2d at 115). But that can become significant only if it is assumed that the product was defective when sold or became defective within the warranty period. That aspect of *Austin* there-

fore provides no assistance in determining when the warranty period began in this case.

**17.** That the oven's design was in material part experimental is evident from Nation's uncontested assertion that Oven 1 was the first and last oven Enersyst ever designed with an aluminum skin. Apparently aluminum is more prone to buckle at high temperatures than other materials.

**18.** This line of analysis should be contrasted with Nation's effort to conflate "delivery" with

One important further consideration supports this Court's denial of summary judgment at this time. Under Enersyst's reading, the warranty would have expired before the cause of action could have accrued as calculated under Section 2.725(b). There is nothing inherently wrong with such an occurrence—who hasn't bought an appliance with a one-year warranty only to have it break down after 13 months?—but here that result seems at odds with the language of the warranty itself, which provides (emphasis added) that the oven will be "free from defects in workmanship and material *under normal use and service*" during the warranty period. Although Enersyst may have included that phrase only to indicate that it was not warranting the oven to do more than it was designed to do, it also creates some tension with Enersyst's argument that the warranty clock began to tick even before the oven was (or could have been) put to *any* use or service.

Because of the unusual circumstances of the case at hand, the use of the term "delivery" in the warranty raises questions of fact not sufficiently addressed in the parties' briefing. As *Baldwin v. New*, 736 S.W.2d 148, 152 (Tex.App.1987) summed up Texas law on using extraneous evidence to shed light on the meaning of ambiguous contracts (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981)):

> If the contract is ambiguous, then the surrounding circumstances may be considered in determining the meaning. However, if the contract is not ambiguous, then a party's construction is immaterial.

*Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951) (citing authorities) gives the standard definition of ambiguity:

> In other words, if after applying established rules of interpretation to the con-

tract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous. In the latter event the contract will be enforced as written and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.

Under Texas law the respective functions of the court and the trier of fact are clearly delineated where contract interpretation is in issue (*Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983) (citations omitted)):

> Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.... When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.

Here several readings of the word "delivery" are possible without ignoring the distinctions among delivery, installation and testing that the contract clearly meant to maintain. Because the contract is ambiguous as to what Enersyst had to do to effect "delivery," summary judgment is inappropriate.

2. *Limitation on Liability.*

 Little discussion is needed to scotch Enersyst's argument that Counts I and II are barred by the warranty provision that limits Enersyst's liability to repair and replacement of defective parts or workmanship. Even if this Court were to assume (without deciding) that Enersyst's disclaimer is sufficiently prominent and understandable to be effective, it still would not bar Nation's damage claim.

Commercial Code § 2.719(b) provides:

---

"installation" as a matter of law. If the product as shipped unassembled by Enersyst had been the selfsame end product that became reassembled at Nation's end without any refashioning—if it were like any number of things that are bought unassembled and require assembly and hookup to put into working order ("put nut A onto bolt B, then insert bolt B into slot C")—the warranty-triggering delivery date would have been the time of arrival at Nation's plant (clear-

ly the "delivery") and not the later date of assembly (the "installation"). And that conclusion would not be altered by the fact that the assembly process was not a mere tongue-in-groove process but involved (for example) some delicacy or care in alignment and realignment, as distinguished from actual onsite alterations in design. But here the need for design changes can fairly be viewed as marking that event as Enersyst's "delivery" of the contracted-for oven.

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

*Lankford v. Rogers Ford Sales,* 478 S.W.2d 248, 251 (Tex.Civ.App.1972), following the Illinois case of *Adams v. J.I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1 (4th Dist.1970), stated that evidence of "repudiation of the limited warranty, . . . wilful failure or refusal to make the repairs needed [or] dilatory, careless or negligent compliance with the terms of the limited warranty" provide evidence that the limited warranty has "failed of its essential purpose."

In spite of the obvious fact (assuming, as this Court must, the truth of Nation's allegations) that Oven 1 still does not work as promised despite years of attempts at repair, Enersyst insists that the limited warranty has not failed of its essential purpose because there were no such bad acts as were recounted in *Lankford* during the warranty period. But that defense assumes a one-year warranty period beginning September 13, 1982. In light of Enersyst's already-discussed failure to establish that date as the beginning of the warranty period, Enersyst's argument here must fall as well.

### CONSUMER ACT CLAIMS

■ Complaint Count III, which invokes the Consumer Act, merits little discussion—even Nation, by its total lack of response to Enersyst's summary judgment motion as it relates to Count III, seems to recognize the validity of Enersyst's position.[19] Enersyst correctly argues the Count III claims as to Oven 1 are barred by Section 17.565, the Consumer Act's statute of limitations:

19. Indeed, it is axiomatic that the party opposing a summary judgment motion may not rest on its pleadings, as Nation has here done, but rather must come forward with evidence to support its claim once the movant has properly made and supported a motion for summary judgment (*Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553). Thus Nation's failure to respond itself suffices to justify granting Enersyst's motion—but it is not, as the ensuing text shows, the only ground for that result.

20. Actually September 13 marks the end of a long process by which Enersyst and Nation ne-

All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading or deceptive act or practice. The period of limitation provided in this section may be extended for a period of 180 days if the plaintiff proves that failure timely to commence the action was caused by the defendant's knowingly engaging in conduct solely calculated to induce the plaintiff to refrain from or postpone the commencement of the action.

That section's time clock could begin to tick on either of two dates: (1) September 13, 1982, when Enersyst shipped Oven 1 to Nation,[20] or (2) January 4, 1985, when Nation first notified Enersyst of the numerous problems that had led Nation to record Oven 1's first down-time on December 26, 1984. Simple arithmetic shows that Nation's November 15, 1988 Complaint was out of time whichever date serves as the beginning of the limitations period.

### PROMISSORY ESTOPPEL CLAIM

Complaint Count IV recites a claim for promissory estoppel. Nation claims (1) that Smith made an oral promise that Enersyst would repair Oven 1 completely as a precondition to Nation's placing with Enersyst its order for Oven 2, (2) that Nation entered into the contract to purchase Oven 2 in reliance on Smith's promise to repair Oven 1 and (3) that Enersyst has failed to live up to that promise to Nation's detriment.

gotiated and consummated their agreement for the sale of Oven 1. That date is thus a conservative proxy for earlier dates (in some cases much earlier) on which Enersyst might be charged by Nation with having made the kind of false or misleading statements actionable under the Consumer Act. This opinion's conclusion that misrepresentations made on September 13 would be time-barred makes it unnecessary to determine when, or if, such misrepresentations in fact occurred incident to the sale of Oven 1.

■ Enersyst moves for summary judgment on Count IV on the ground that the claim is barred by Section 2.201(a), the Commercial Code's statute of frauds:

Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Enersyst cites *Rockland Industries, Inc. v. Frank Kasmir Associates*, 470 F.Supp. 1176 (N.D.Tex.1979) for the proposition that promissory estoppel trumps Section 2.201's statute of frauds defense only where the defendant made false assurances that the statute's requirements had been or would be met. In contrast with that situation, Enersyst urges, here no misrepresentation was made that the promise to repair Oven 1 had been or would be reduced to writing.

■ That argument entirely misapprehends the principles every first-year law student learns in contracts class. Enforcement of a contract is barred by the statute of frauds only where (1) the contract

sought to be enforced falls within the class of cases covered by the statute, (2) the agreement is not evidenced by a contemporaneous writing and (3) the case does not fall under an exception to the statute. According to Official Comment 1:

The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.

As to the first requirement, the contract Nation asserts—one for the sale of goods (Oven 2) in excess of $500—falls squarely within the coverage of the statute. It is less clear whether Enersyst's defense meets the second requirement,[21] but in light of the unmistakable applicability of at least three exceptions to the statute, this Court need not resolve that issue.

First, Section 2.201(b) provides:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received.

Here both parties are merchants,[22] and Nation's purchase order confirms an earlier claimed contract[23] and is sufficient for

21. Although there is no single document that is signed by both parties and that by itself creates obligations binding on both parties, the combination of the signed Enersyst quotation and the signed Nation purchase order that (1) describes the oven in language identical to that in the Enersyst quotation and (2) makes specific reference to such a quotation are together sufficient to evidence Enersyst's obligation to sell the oven. Whether or not Enersyst was strictly bound by that exchange of documents in spite of the quotation provision that "[w]hen accepted (signed) by Purchaser, this document will become binding upon Supplier only when approved by an executive officer of Enersyst" is really irrelevant. At most that provision raises a factual issue as to whether the approval requirement was met when Smith, himself an executive officer of Enersyst, submitted the quotation—an issue that has not been addressed by the parties but is sufficient to foreclose summary judgment in Enersyst's favor.

22. Under the Commercial Code Nation need not be a merchant in the goods that are the subject of the transaction to be treated under the merchant exception to the statute of frauds. Instead, Section 2.104(a) defines "merchant" as anyone "who ... by his occupation holds himself out as having knowledge or skill peculiar to the practices ... involved in the transaction." Because the practices involved in the transaction are not specific to any industry—all people in business know how to answer their mail in ten days, for example—Official Comment 2 says:

For purposes of these sections almost every person in business would, therefore, be deemed to be a "merchant"....

23. Nation's purchase order closes with the following:

statute of frauds purposes to bind Nation. In addition, Enersyst has not argued that it did not know of the purchase order nor that it gave timely written notice of objection. Accordingly, Section 2.201(b) applies to deprive Enersyst of any statute of frauds defense it may have had.

Moreover, two alternate reasons for denying Enersyst's motion as to Count IV are afforded by Section 2.201(c):

A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable

\* \* \* \* \* \*

(2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted.

Enersyst has never disputed Nation's allegations that it actually agreed to, and did, sell Oven 2 to Nation or that it was received and accepted by Nation.

Enersyst rather seems to be contending (without spelling it out) that the statute of frauds somehow bars Nation from asserting the oral side agreement by which Enersyst allegedly promised to repair Oven 1 as

part of the contract for the purchase of Oven 2. But that is really an issue for the parol evidence rule, not the statute of frauds. And even were this Court inclined to advance a parol evidence contention that Enersyst has not made on its own,[24] the argument would be no better than a straw man. In this instance the claimed oral side agreement is in addition to, but it is not at all inconsistent with, the terms contained in the written documents—and those documents do not purport to be a fully integrated contract at that.[25]

Finally, *Rockland* addresses only the question whether a valid statute of frauds defense may be circumvented by asserting a promissory estoppel claim, not whether the statute provides a defense to a case like this one. Where, as here, Enersyst has no statute of frauds defense to the contract in the first place, any reliance on *Rockland* is misplaced.

## CONCLUSION

Enersyst has demonstrated that no genuine issues of material fact remain as to Nation's Count III claim as to the sale of Oven 1, and its summary judgment motion as to that claim is hereby granted. Enersyst has failed to meet its burden with respect to the other Counts, however. Its motion as to those Counts is denied, and the case will go forward on Nation's remaining claims.

---

CONFIRAMTION [sic]: DO NOT DUPLICATE ORDERED BY ARTHUR JACKSON QUOTED BY DON SMITH.

**24.** Even apart from any question as to this Court's raising of issues or arguments the lawyers may have missed, here it appears that Enersyst's counsel have made a calculated choice to frame the issue in terms of the statute of frauds rather than the parol evidence rule. Merely raising the parol evidence rule would have placed Enersyst in an inconsistent position vis-a-vis its summary judgment motion: It would simultaneously be urging that no written contract existed for statute of frauds purposes, that the very same noncontract was fully integrated, and yet that the contract was unambiguous on its face.

**25.** Enersyst's only hope would be to contend that its quotation document purports to create an integrated agreement by providing:

Insofar as this document acts as an offer to sell, acceptance hereof is expressly limited to all terms and conditions appearing herein. No terms or conditions other than those appearing herein shall be deemed to be part of this offer, although they may have been part of negotiations at a prior time.

But that merely raises a factual issue as to whether the parties' contract resulted from traditional offer and acceptance, with Enersyst's quotation as an offer to sell and Nation's purchase order as an acceptance, or from Nation's purchase order as an offer to buy that was accepted by performance on the part of Enersyst. If the latter were the case, there would be a further issue as to whether the statement in the purchase order noting the Smith quotation (see n. 23) reflects an intent to adopt the above term to make the contract integrated. In any case, these presently unaddressed issues would require the denial of any summary judgment motion based on the parol evidence rule.

## APPENDIX

As indicated in footnote 2 to the text of this opinion, the Complaint includes—in addition to Nation's primary claims relating to Ovens 1 and 2—claims arising out of Enersyst's sale to Nation of some allegedly defective coolers. D.R.Mem. 1 asserts:

> The plaintiff, Nation Enterprises, Inc. ("Nation"), by its lack of response has conceded that summary judgment is proper in two instances.... Secondly, Nation has no claim for damages relating to the coolers.

It is wrong.

While it is true that a party objecting to entry of summary judgment must come forth with evidence to support the challenged claims (see n. 19), in this instance Enersyst has failed properly to bring into issue Nation's claims relating to the coolers. Enersyst's Motion for Summary Judgment says nothing at all about coolers—it treats solely with Nation's Oven 1 claims. Similarly, Enersyst's memorandum in support begins by summarizing its motion as follows (D.Mem. 2):

> Enersyst's Motion for Summary Judgment addresses itself to claims regarding Oven 1 in Counts I, II, III and IV of the Amended Complaint.

Enersyst's first and only reference to coolers before it filed its Reply Memorandum (with the assertion quoted at the outset of this Appendix) was this conclusory statement on the last page of its memorandum in support (D.Mem. 7):

> 7. *All Claims for Damages Resulting from the Coolers Should be Dismissed*
>
> Nation has produced no evidence of damages attributable to the Enersyst coolers. Therefore, summary judgment should be granted regarding any alleged defects of the coolers.

### III. CONCLUSION

For the reasons set forth, Enersyst is entitled to summary judgment for all claims regarding Oven 1 and the coolers in Counts I to IV of the Amended Complaint.

Where the *motion* itself (the operative document) was thus entirely silent as to the coolers, Nation can hardly be faulted for not having addressed itself to that subject. For that reason, this Court finds that Enersyst has not properly moved for summary judgment with respect to the coolers and expresses no opinion on that aspect of the Complaint. If Enersyst wishes to have this Court deal with that portion of Nation's claim, the proper procedure is to file a motion to that effect so that an appropriate briefing and factual submission schedule can be established.