719 A.2d 541

**WASHINGTON FREIGHTLINER, INC.**

v.

**SHANTYTOWN PIER, INC.**

**No. 38, Sept. Term, 1997.**

Court of Appeals of Maryland.

Sept. 8, 1998.

Reconsideration Denied Nov. 17, 1998.

Brian L. Wallace (Wallace & Daneman, P.A., Baltimore), on brief for MAN Roland, Inc.

John W. Geldmacher (John W. Geldmacher, P.A., Reistertown), on brief for Washington Freightliner, Inc.

Broughton M. Earnest (Ray L. Earnest, Piper & Marbury, L.L.P., Easton; Richard M. Kremen, C. Kevin Kobbe, Piper & Marbury, L.L.P., Baltimore), all on brief, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

RODOWSKY, Judge.

This case involves the application of the four-year statute of limitations under the Sales Article of the Uniform Commercial Code to breaches of implied warranties in the sale of marine engines. The statute is Maryland Code (1975, 1997 Repl.Vol.), § 2–725 of the Commercial Law Article.[1] In relevant part it reads:

"(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered."

(Emphasis added).

At issue is whether the statute began to run when the seller caused the engines to be delivered to the boat yard which later installed the engines in a boat that it was constructing for the buyer, or whether the running of the statute was postponed until the engines were "commissioned," that is, when the boat was subjected to a trial run at sea at various speeds.

The plaintiff, Shantytown Pier, Inc. (Shantytown), is a family business based in Ocean City, Maryland, that owns passen-

---

1. Unless otherwise indicated all statutory references are to Maryland Code (1975, 1997 Repl.Vol.), Commercial Law Article.

ger boats. Shantytown sells fishing trips, nature cruises, and other boating excursions to paying passengers. On March 15, 1990, Shantytown contracted with Lydia Yachts of Stuart, Inc. (Lydia), a boatyard in Stuart, Florida, for the construction of a new 77–foot "party/fishing boat," the Ocean City Princess (O.C.Princess). Sometime after June 16, 1990, Shantytown purchased for use in the O.C. Princess three MAN D2840LXE 820–horsepower, 10–cylinder engines from Washington Freightliner, Inc. (WFI), one of the defendants. WFI, based in Capitol Heights, Maryland, is an authorized dealer in engines manufactured by another of the defendants, MAN Roland, Inc. (MAN), a German corporation with offices in the United States. The third defendant in this action is Marine Mechanical Systems, Inc. (MMS), an authorized distributor of MAN engines. MMS is based in Pompano Beach, Florida.

Shantytown purchased the three MAN engines at a total price of $163,000, "FOB Pompano Beach, Florida." The entire purchase price was paid before delivery. MMS caused the engines to be delivered to Lydia no later than September 30, 1990. Lydia completed construction of the O.C. Princess, and it was commissioned on April 20, 1991.

On ten separate occasions during nearly four years of operating the O.C. Princess, Shantytown experienced failures of one or another of each of the three engines. Although some of the failures were due to human error, most were due to complications involving faulty pistons. MAN's agents kept addressing the problems and performing repairs, but the problems, particularly failures related to the pistons, kept recurring. In April 1994, Shantytown, for $30,000, purchased another MAN engine for the O.C. Princess to replace one of the original MAN engines; within months, it too began suffering piston failure.[2]

---

**2.** Shantytown's expert opined that the engines were both "overrated and overfueled." By overrating, the witness meant that, although the engines were capable of producing at the rated 820 horsepower and 2300 rpms, operating them at that level would produce premature failures of the type experienced by Shantytown.

The expert defined overfueling as follows:

These failures led Shantytown to file suit on October 6, 1994, against MAN, WFI, and MMS. The complaint alleged breaches of express warranty, of contract, and of the implied warranties of merchantability and of fitness for a particular purpose.

Each defendant moved for summary judgment based, *inter alia*, on limitations grounds. Judge Theodore R. Eschenburg denied these motions. Prior to trial the plaintiff experienced an eleventh piston failure and decided to replace all three MAN engines with engines manufactured by another company. Three days before trial Shantytown, with leave of court, voluntarily dismissed its express warranty and breach of contract claims, leaving only the implied warranty claims against the three defendants.

At a jury trial with Judge Thomas C. Groton, III presiding, the defendants renewed their limitations argument by a motion for judgment at the conclusion of the plaintiff's case and by a motion for judgment at the conclusion of all the evidence, on which the court reserved both rulings. The jury found that the implied warranties had been breached, that there was an agency relationship between all of the defendants, and that the damages were $236,919.21. The court denied the defendants' motion for judgment notwithstanding the verdict.

Judge Eschenburg's order denying the defendants' motion for summary judgment gave no reasons, but Shantytown had argued that tender of delivery had not occurred until the O.C. Princess was commissioned.

----

"In a diesel engine, the temperatures that are seen in the combustion chambers are a function of the amount of fuel that is put in on each combustion stroke. As you increase the fuel to the engine, increase the air to the engine through the turbo chargers and through the cooler system, the engine—each cylinder increases its output, its power output. It also increases the temperatures that exist inside the cylinder. [When] those conditions are increased to the point where the components can no longer successfully deal with those temperatures, they prematurely fail."

He concluded that excessive heat produced internal cracking, melting, and ultimately, total failure of the pistons.

At trial the most detailed description of commissioning was given by John Wilhelm who had been in charge of the service and maintenance aspects of the MMS business. His deposition testimony, introduced by Shantytown, reads in relevant part as follows:

"Q   [C]an you just give me sort of a general understanding of what it means in your trade to commission engines so that in April of 1991 when you commissioned these three new engines, what kind of things would you do?

"A   You have to put a variety of monitoring equipment on the engines in the engine room itself to monitor operating temperatures, pressures, exhaust temperatures, engine room depression, and record the values at a variety of speeds, including wide-open throttle.

"Q   Now, are these instruments that you are talking about, are they separate from the normal instruments that the boat would permanently be equipped with?

"A   Some boats are equipped with similar instrumentations.   During commissioning we generally use our own.

"Q   So you take the boat to sea and you operate it for approximately how long?

"A   It depends on conditions and a number of things. But there is a prescribed format that MAN has set forward, and you have to complete the forms.

"Q   And was that commissioning done in this case without incident?

"A   Yes.

"Q   So that on or about April 20, 1991, or whatever that precise date was of the commissioning, as far as you were concerned, the engines had been properly installed and tested and seemed to be working properly?

"A   The details escape me right now, but as long as all the numbers fell in normal operating parameters, yes.   And I believe they did."

The engines were not commissioned separately from the vessel; rather, both were commissioned simultaneously.   Cap-

tain Robert Gowar, one of two captains of the O.C. Princess, spoke of "when we were getting ready to commission the boat and the engine." Captain Monty Hawkins, the vessel's other captain, testified that the commissioning process took place "over a couple of different sea trials," and implied that different individuals may have been present on different days. R. Charles Nichols, Shantytown's president, testified that six people were on the vessel during commissioning: himself; Monty Hawkins and Robert Gowar; John Wilhelm, MMS's chief engine mechanic; Ed Clifton, described as "one of the Lydia Yacht folks"; and an individual named "Bo," the yard foreman for Lydia. Captain Hawkins described "Bo" as "acting master" at the time of the sea trials.

In denying the motion for judgment notwithstanding the verdict, Judge Groton found that Shantytown was "not given control of the engines until they were placed in the boat and the boat was commissioned, and then when it was first commissioned, the boat wasn't even in their control. It was in the control of ... more than Lydia.... It was some of [the defendants'] representatives that were part of the commissioning that, in essence, were in charge of that process."

The defendants appealed to the Court of Special Appeals, which, in an unreported opinion, affirmed the trial court's ruling on limitations. The Court of Special Appeals, as is this Court, was required to decide whether tender of delivery under § 2–725(2) occurred when the defendants delivered the engines for Shantytown to Lydia or when the O.C. Princess was commissioned. In addressing that issue the Court of Special Appeals, as is this Court, was faced with a void in the record because the contract of sale is not in evidence.[3] The

---

**3.** Shantytown voluntarily dismissed its claims that were based on the express contract so that it could take the position that the express contract was irrelevant. The defendants' position was that the express contract consisted of a letter agreement and enclosed "boilerplate" provisions. During cross-examination of Shantytown's chief operating officer, the defendants sought to introduce the letter agreement and at least those documents listed in the letter, as enclosures thereto, that the defendants contended limited remedies and excluded implied warran-

record, however, does contain a two-page quotation which all parties in effect agree contains the specific terms (as contrasted with the general terms) for the sale to Shantytown. The quoted price of $163,000, F.O.B. Pompano Beach, includes "Start up and Commissioning (8 Hr. Allowance)."

The Court of Special Appeals held that the defendants had the burden of proving that limitations had run and, because "the trial court had before it evidence from which it reasonably could have decided that the price quotation and testimony at trial constituted sufficient proof of a requirement of commissioning, . . . that [defendants] had thus failed to carry their burden of persuasion."

We granted the defendants' petitions for certiorari, each of which raised the limitations issue.

I

The limitations issue presented here is quite narrow. "A breach of warranty occurs when tender of delivery is made." § 2–725(2). The cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* In other words, there is no discovery rule under § 2–725. Further, the only statutory exception to accrual on tender of delivery is that, "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered." § 2–725(2). Shantytown does not rely on this statutory exception to accrual, and it denies

---

ties. Shantytown objected on the ground that the attempted exclusions and limitations did not comply with statutory requirements. Because the parties could not agree on what comprised the contract, the defendants, out of the presence of the jury, examined the witness in an effort to prove the contract. The witness testified that he did not recall seeing the enclosures. From this the court found that the witness was "saying [the enclosures were] never part of this contract," and the contract was not admitted into evidence. This ruling has not been challenged on appeal.

that a warranty of future performance is necessary to defer accrual of its claim to the commissioning of the engine.

Because the contract of sale is not in evidence, Shantytown cannot argue that the contract has specially defined "tender of delivery." Further, whether the defendants made any affirmations of fact about the engines' performance is immaterial, because the plaintiff has abandoned reliance on any express warranty.

Shantytown's claim rests exclusively on breach of the implied warranties of merchantability and of fitness for a particular purpose. With respect to limitations on those claims, W. Hawkland, *Uniform Commercial Code Series* § 2–725:02 (1994 ed.) (Hawkland), categorically states:

"By definition, an implied warranty is not explicit, and, therefore, the exception [for warranties of future performance] has no application to implied warranties. Stated differently, *the statute of limitations will always start to run against claims based on implied warranty from the time when delivery of the goods is tendered.*"

*Id.* at 725 (emphasis added).

Relying on the defendant's quotation that included eight hours of commissioning, Shantytown argues that tender of delivery had been postponed. As presented in this case, that issue is one of law. No party to this case that was tried before a jury has contended at any level of court that the limitations defense involved an issue of fact. If the legal meaning of "tender of delivery" in the context of this case is delivery to Lydia, then the defendants have produced sufficient evidence to prove that limitations have run. Contrary to the analysis of the Court of Special Appeals, the defendants had no burden of persuading the trial court factually that accrual of the claim was not postponed until commissioning.

II

Critical to the analysis, then, is ascertaining precisely what the legislature meant when it used the words "tender of

delivery" in § 2–725. Section 2–503(1), in relevant part, states:

"Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery."

Official Comment 1 to § 2–503 explains that

"[t]he term 'tender' is used in this Title [Two] in two different senses. In one sense it refers to 'due tender' which contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed. Unless the context unmistakably indicates otherwise this is the meaning of 'tender' in this Title and the occasional addition of the word 'due' is only for clarity and emphasis. *At other times it is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation.* Used in either sense, however, 'tender' connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner."

(Emphasis added).

Thus, the Official Comment reveals a narrow and a broad definition of "tender of delivery." The narrow definition is limited to a tender of conforming goods. The broader definition includes the tender of *non*conforming goods. In the context of limitations the narrow meaning of tender of delivery has been rejected by virtually every court that has considered the question. Not the least of the reasons for rejecting the narrow meaning is the logical paradox such an interpretation would create. If "tender of delivery" means "tender of conforming goods," then a seller who never ships conforming goods would never trigger the running of the statute. *See Ontario Hydro v. Zallea Sys., Inc.,* 569 F.Supp. 1261 (D.Del. 1983). That court rejected a "conformity" argument, holding that

"[f]rom a policy standpoint, it is important to note at the outset that the phrase 'tender of delivery' can have a broader meaning than the plaintiff contends . . . .

"If the Court were to apply the phrase as Hydro suggests, then until the seller tenders conforming goods, the limitation period provided in § 2–725 would never apply. This would circumvent the very purpose of § 2–725, which, as discussed above, is to provide a finite period in time when the seller knows that he is relieved from liability for a possible breach of contract for sale or breach of warranty."

*Id.* at 1267. *See also Navistar Int'l Corp. v. Hagie Mfg. Co.,* 662 F.Supp. 1207, 1210 (N.D.Ill.1987) (under this theory, "a cause of action for breach of warranty would never 'accrue' and could be brought at any time. Such a construction of a statute of limitations would be inherently self-contradictory."); *Nelligan v. Tom Chaney Motors, Inc.,* 133 Ill.App.3d 798, 802, 88 Ill.Dec. 826, 479 N.E.2d 439, 442 (1985) ("We note initially that section 2–725(2) refers to 'tender of delivery' and not, as plaintiff suggests, a 'conforming tender of delivery.' In addition, plaintiff's argument that the action is not barred because there has never been a conforming tender of delivery, when read with section 2–725(2) which provides that a cause of action accrues when tender of delivery is made, would lead to the absurd result that the period of limitations never begins to run in cases such as this where a plaintiff takes delivery and retains possession of goods for a considerable period of time before notifying the seller of possible defects.").

▮ The proposition that nonconforming tender of goods is sufficient to trigger the statute of limitations in § 2–725 is essentially hornbook law. As Anderson explains:

"When the cause of action arises from a breach of warranty that is not a warranty as to future performance the breach of warranty occurs, and consequently the cause of action accrues, when tender of delivery of the nonconforming goods is made.

"A defective tender of goods starts the running of the period of the statute of limitations, without regard to wheth-

er the nonconformity is known or unknown. The fact that goods are nonconforming does not prevent there being a tender of the goods which is the time that the statute of limitations begins to run, for the reason that a 'due tender' of conforming goods is not required to initiate the limitations."

5 R. Anderson, *Anderson on the Uniform Commercial Code* § 2–725:103, at 269–70 (rev.3d ed.1994) (footnotes omitted). Or, as Hawkland puts it: "It should be noted that UCC section 2–725(2) refers to 'tender of delivery' and not 'conforming tender of delivery.' Tender of nonconforming goods, therefore, will trigger the statute of limitations in warranty cases not involving explicit agreements to extend to future performance." Hawkland § 2–725:02, at 724.

Thus, where a personal injury claim is based on breach of an implied warranty in the sale of a tractor, the period of time within which to sue can expire before any harm occurs to the person. *Mills v. International Harvester Co.,* 554 F.Supp. 611, 613 (D.Md.1982).

Shantytown argues that this Court's opinion in *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.,* 252 Md. 611, 250 A.2d 886 (1969), is relevant to the conclusion that "tender of delivery," in the limitations context, does not occur until "all [of] the seller's obligations with respect to physical delivery [have] been fulfilled." Brief and Appendix of Appellee at 19. *Wilke* involved the sale and installation of an emergency diesel generator to a mechanical contractor who was a subcontractor on a federal construction project. *Wilke,* 252 Md. at 613, 250 A.2d at 887. "The job progressed with agonizing slowness...." *Id.* "Although it was far too early to install the generator, [the seller] was anxious to deliver it to the job site and did so...." *Id.* When delivered, the generator lacked two starting batteries because the seller " 'did not want [the buyer] to start it or fool with it.'" *Id.,* 250 A.2d at 888. The evidence was that the seller told the buyer " "[t]his is my baby until I start it and turn it over to you." '" *Id.* During the winter following the physical delivery of the generator, it

was damaged by freezing. Shantytown relies upon the following passage from the opinion in *Wilke:*

> "Under the facts of this case, we have no difficulty in holding that the delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract. It could not constitute such a delivery and performance until the generator had been installed, started up, and field tests completed to the satisfaction of the government. Until then, risk of loss remained with [the seller] regardless of where title may have stood."

*Id.* at 618, 250 A.2d at 890.

Under the facts in *Wilke* there was no tender of delivery in either the narrow or the broad sense. The goods were not conforming and the seller did not make "an offer of goods ... under a contract as if in fulfillment of its conditions ...." § 2–503 official comment 1.

The question in *Wilke* was when the risk of loss passed from seller to buyer under § 2–510(1) ("Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."). Moreover, this Court also made it expressly clear that § 2–510 applied the narrow definition of "tender of delivery." *See Wilke,* 252 Md. at 618, 250 A.2d at 890 (" 'Under subsection (1) [of § 2–510] the seller by his individual action cannot shift the risk of loss to the buyer unless his action *conforms with all the conditions resting on him under the contract.*' ") (quoting § 2–510 official comment 1) (emphasis added). Thus, *Wilke* is not authority for the narrow definition of "tender of delivery" under § 2–725.

Shantytown also relies on the district court opinion in *In re Automated Bookbinding Services, Inc.,* 336 F.Supp. 1128 (D.Md.), *rev'd,* 471 F.2d 546 (4th Cir.1972). That bankruptcy decision concerned a contest between two creditors of the buyer-debtor. One creditor claimed under a security interest that included after-acquired property, while the other creditor claimed under a later purchase money security interest which,

per Md.Code (1957, 1964 Repl.Vol.), Art. 95B, § 9–312(4), would prevail if perfected within ten days after the debtor received "possession of the collateral." To determine what "possession" meant, the court looked to §§ 2–503 ("Manner of seller's tender of delivery") and 2–507 ("Effect of seller's tender; delivery on condition"). The bookbinding machine had been purchased by the debtor from a European manufacturer, and "[i]t arrived at [the buyer's] plant in seventeen cases of component parts with an approximate gross weight of thirteen tons." 336 F.Supp. at 1131. The contract of sale required the seller to supervise erection of the machine and to put it in first-class running order. *Id.* at 1130. Under these circumstances the district court held that the debtor did not have possession until the machine was assembled with the result that the purchase money security interest was timely perfected. It is apparent that the seller in the *Automated Bookbinding* case had not tendered goods "as if in fulfillment of" the contract's conditions. *Id.* § 2–503 official comment 1.[4]

Maryland cases which *do* analyze § 2–725 have unambiguously declared that the purpose of the statute is to protect defendants from stale claims. *See Mattos, Inc. v. Hash,* 279 Md. 371, 377, 368 A.2d 993, 996 (1977); *Frericks v. General Motors Corp.,* 278 Md. 304, 309–16, 363 A.2d 460, 462–66 (1976); *see also Mills v. International Harvester Co.,* 554 F.Supp. at 612–13. As one commentator explains, "[t]he result of [§ 2–725(1) and (2) ] is a fairly short statute of limitations designed more to permit the parties to destroy their records after four years than to punish them for laches. Thus, for example, a party may be barred from pursuing an action he did not know existed." Hawkland § 2–725:02, at 724.

---

4. The United States Court of Appeals for the Fourth Circuit, speaking through Judge Soboloff, reversed, holding that the tender of delivery analysis of the district court had no application to "possession" for purposes of U.C.C. Article 9, and that the debtor had "possession" when it received the unassembled parts. *In re Automated Bookbinding Servs., Inc.,* 471 F.2d 546, 553 (4th Cir.1972).

In *Navistar International Corp. v. Hagie Manufacturing Co.,* 662 F.Supp. 1207, involving the sale of high clearance crop sprayers, the court rejected the argument that "tender of delivery" in § 2–725 ought to be read narrowly. *Id.* at 1210. Quoting the Official Comment to § 2–503, the court emphasized that " *'other times [the term "tender"] is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation.'* " *Id.* The court applied the latter reading. *Id.; see also Ontario Hydro v. Zallea Sys., Inc.,* 569 F.Supp. 1261; *Nelligan v. Tom Chaney Motors, Inc.,* 88 Ill.Dec. 826, 479 N.E.2d 439.

### III

In an effort to avoid the rule of § 2–725 and the results of the decisions reviewed above, Shantytown emphasizes cases in which the seller was obliged by the contract to install the goods, or to test them. Arguing inductively from these cases Shantytown concludes that, where the seller has post-delivery obligations to install or to test, tender of delivery is postponed until those obligations have been performed. As we shall see below, the decisions on which Shantytown relies are explained on a basis other than the general principle for which Shantytown contends.

### A. Installation

There is case law which stands for the proposition that the clock in § 2–725 does not begin to run until after goods have been installed, where, under the contract, the seller is expressly obligated to install. *See Dowling v. Southwestern Porcelain, Inc.,* 237 Kan. 536, 543, 701 P.2d 954, 960 (1985) (where a storage silo was shipped to the buyer more than four years before suit, but its erection by the seller was completed within four years of suit, "tender of delivery" was the later date because the buyer "purchased a package deal—he did not purchase the raw equipment, separate from the installation; he contracted for a finished silo"); *Atlas Indus., Inc. v. National Cash Register Co.,* 216 Kan. 213, 221, 531 P.2d 41, 47

(1975) (where installation took more than one year "tender of delivery of the accounting machine, sold to Atlas by NCR and installed by NCR in Atlas' plant, did not occur until installation of the machine was completed").

Not all courts, however, agree that a seller's installation obligation postpones tender of delivery. In *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442 (S.D.N.Y.1986), the plaintiff ordered three emergency diesel generators from the seller. The engines were delivered to plaintiff's nuclear power plant in 1976, but not installed until 1981. *Id.* at 1445. Suit was filed in 1985. *Id.* at 1446. The buyer contended that "tender of delivery" of the diesels was not made until their final installation in 1981, because it was the seller's obligation to install the generators. The buyer's claim, based on breach of a warranty that the diesels would " 'be free from defects in design, workmanship and material and [would] be suitable for their intended purpose,' " *id.* at 1455, was time barred. "This warranty of merchantability [was] a *present* warranty, a breach of which occurs upon delivery of the goods." *Id.* "Moreover, the ... contract contained no provision that the goods be tested to assure conformance with the contract before delivery was complete." *Id.* The court relied on the rule that "even tender of *non* conforming goods is considered delivery. In this case, 'tender' coincided with actual delivery of the diesels in 1976." *Id.* (citation omitted).

In any event, in the case before us, the defendants contracted to sell engines—not to sell engines and to install them. WFI delivered the engines F.O.B. Pompano Beach in accordance with the contract; Lydia installed the engines.

## B. Testing

Shantytown also relies on cases involving sales contracts under which the seller promised that the goods would attain certain performance criteria before the buyer was obligated further to perform. Under the particular contracts involved in those cases, testing was intended to precede tender of delivery.

*City of New York v. Pullman Inc.,* 662 F.2d 910 (2d Cir.1981), *cert. denied sub. nom.,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), involved a $210 million contract between New York City and Pullman for 754 subway cars of a new design, the R–46. Their undercarriages were radically different from those of any subway cars previously used in New York City. *Id.* at 912–13. The contract specifications provided for the initial delivery of "ten subway cars for final on-line tests and inspection" and "that the R–46 design would be required to pass a 30 day on-line inspection before it would 'conform' to the contract requirements." *Id.* at 919. The buyer sued for breach of warranty more than four years after delivery of the test cars in March 1975 but within four years of the completion of testing in December 1975. The court held that limitations were not a bar on the following rationale.

"Until that inspection occurred, therefore, there could be no tender of 'conforming goods' within the meaning of § 2–503(1). Moreover, under the contract [buyers] were not obliged to take any steps until [seller] conformed to the specifications by delivering cars which had completed the 30 day test, since the contract specifically provided that any cars built before the 30 day test was completed were constructed at the seller's risk. Accordingly, tender of delivery could not occur, and did not occur, until the required test of the sample train was completed. . . ."

*Id.*

The rationale of *Pullman* is not transferable to the sales transaction before us. Shantytown exclusively relies on the implied warranties of merchantability[5] and of fitness for a

---

5. Section 2–314(2) provides:

"Goods to be merchantable must be at least such as

"(a) Pass without objection in the trade under the contract description; and

"(b) In the case of fungible goods, are of fair average quality within the description; and

"(c) Are fit for the ordinary purposes for which such goods are used; and

particular purpose.[6] Implied warranties are present warranties that are breached on tender of delivery. Although the opinion in *Pullman* does not identify the warranty there sued upon as implied or express, it is inconceivable that the parties entered into a $210 million contract that did not *expressly* address the subject of warranties. Further, under the terms of the *Pullman* contract, the city and its transit authority were not obliged to take any steps by way of performance until the ten test cars, by the testing process, had been found to conform to the contract. Stated another way, the *Pullman* contract negated the possibility that the delivery of nonconforming goods could be tender of delivery. The *Pullman* contract blocked the possibility of applying the broader meaning of tender of delivery inasmuch as the test trials were designed to demonstrate conformity before the buyers were obliged "to take any steps." *Id.* at 919.

Shantytown also relies on *St. Anne–Nackawic Pulp Co. v. Research–Cottrell, Inc.*, 788 F.Supp. 729 (S.D.N.Y.1992), a denial of summary judgment sought on the ground of U.C.C. § 2–725. The contract called for the supply and installation, for $2,065,000, of a system to abate sulphur fumes at the buyer's wood pulp plant in order to meet governmental requirements. The contract contained a "Performance Warranty" which provided

> "(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> "(e) Are adequately contained, packaged, and labeled as the agreement may require; and
> "(f) Conform to the promises or affirmations of fact made on the container or label if any."

**6.** Section 2–315(1) provides:
"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

"that seller's performance is complete once the system satisfies the performance specifications, including the promised [Total Reduced Sulfur] level [10 PPM of total reduced sulphur], for a continuous three-day testing period to be conducted within 120 days of 'start up' but 'in any event not later than nine (9) months after mechanical completion of the scrubber.' "

*Id.* at 731. Under the contract the buyer retained ten percent of the price until the performance warranty was satisfied. That standard was never met, and, eventually, the seller took the position that the required performance was beyond its reasonable control. *Id.* at 732. The buyer sued and was met with a limitations argument that tender of delivery occurred when the system failed the second of the start-up tests.

The court in *St. Anne* reasoned, in reliance on *Pullman,* that during the period of start-up testing, the goods were neither conforming nor nonconforming. *St. Anne,* 788 F.Supp. at 735. The court pointed out that "neither party expected the system to work upon mechanical completion" and that the parties recognized that " '[t]he System required a lengthy implementation period before it was expected [to] achieve its guaranteed performance.' " *Id.* at 736. Apparently, within four years of suit the seller was still attempting to reach the performance standard. The seller, said the court, "could not have breached the Contract while it was still fulfilling the performance warranty, which does not place a time limit on defendant's obligation to correct the system." *Id.* Under these circumstances, no cause of action accrued while the seller "was still performing under the Contract." *Id.* This reasoning, like that in *Pullman,* is not transportable to the implied warranties sued upon in the instant matter.

Federal district courts, including those in the Second Circuit, have not read *Pullman* as an invitation to postpone the accrual of limitations under U.C.C. § 2–725 beyond actual delivery. *See H. Sand & Co. v. Airtemp Corp.,* 738 F.Supp. 760, 766 (S.D.N.Y.1990) ("We are ever so mindful that the *Pullman* holding is based upon a rare and distinctive set of facts and thus we must be restrictive in our application of its

rulings."), *aff'd in part, rev'd in part,* 934 F.2d 450 (2d Cir.1991); [7] *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1445 (*Pullman* inapposite where seller delivered the entire order); *City of Cincinnati, Ohio v. Dorr–Oliver, Inc.,* 659 F.Supp. 259, 263 (D.Conn.1986) ("[T]o follow the more narrow definition of tender of delivery found in *Pullman* in the ordinary case would be to undermine the very purpose of § 2–725."); *Ontario Hydro v. Zallea Sys., Inc.,* 569 F.Supp. 1261, 1267 ("On factual and policy grounds, this Court finds that there are enough distinctions between *Pullman* and this case to warrant different results.").

In cases where the testing was less critical than in *Pullman* and *St. Anne*—even though it was still an element of the contract—courts have held that limitations began with delivery and not on completion of testing. In *Raymond–Dravo–Langenfelder v. Microdot, Inc.,* 425 F.Supp. 614 (D.Del.1976), the plaintiff, the buyer of prefabricated steel pier forms from the defendant, brought suit five days outside of the statutory period, and the plaintiff argued that it had withheld acceptance until certain inspections were conducted. Because any failure under the inspections would have triggered an ongoing obligation of the seller to repair, the plaintiff argued that the statute of limitations did not begin to run until after the goods were accepted. The court rejected this line of analysis:

> "The Code clearly states that a cause of action for breach of warranty accrues when tender of delivery is made. Whether or not the buyer at that time 'accepts' the goods, as that term is used in the Code, or, on the other hand, withholds

---

7. In *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450 (2d Cir.1991), the reversal of the summary judgment granted on limitations grounds was because of an inference that the goods had been relocated to the buyer's site for safe storage, prior to tender of delivery, thus making the case similar to *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.,* 252 Md. 611, 250 A.2d 886 (1969). In *H. Sand & Co.* the Second Circuit parenthetically described *City of New York v. Pullman Inc.,* 662 F.2d 910, as a case "where contract required test of small sample before design deemed to conform to contract and before seller was allowed to deliver bulk of goods, receipt of sample did not constitute tender of delivery." *H. Sand & Co.,* 934 F.2d at 455.

acceptance until he or she has had an opportunity to fully inspect for defects, does not affect when the buyer must institute suit for breach of warranty. This is so even if the defect does not appear until after the limitations period has run."

*Id.* at 617 (footnote omitted).

*Ontario Hydro v. Zallea Sys., Inc.,* 569 F.Supp. 1261, involved a contract that called for the defendant to deliver various expansion joints over a three-year period, and the last of the joints was delivered more than four years before suit was filed. *Id.* at 1264–65 & n. 3. The court rejected the plaintiff's contention that the limitation period could not begin to run until after the goods were inspected, even though the contract specifically gave the buyer the right to inspect the goods and reject them if they did not conform. *Id.* at 1267. The *Ontario Hydro* court focused in on the indefiniteness of the remaining obligations:

"In the present case, there was no finite period for inspection. Moreover, the inspection clause was not directed to the tender of delivery aspect but rather to Hydro's right to reject the goods once they were delivered, for the clause focuses not on delivery but on the preservation of Hydro's right to reject after full delivery."

*Id.* at 1268. *See also Binkley Co. v. Teledyne Mid–America Corp.,* 460 F.2d 276 (8th Cir.1972), *aff'g* 333 F.Supp. 1183 (E.D.Mo.1971); *Ridle v. Sprayrite Mfg. Co.,* 198 Ill. App.3d 597, 144 Ill.Dec. 753, 555 N.E.2d 1272 (1990); *American Alloy Steel, Inc. v. Armco, Inc.,* 777 S.W.2d 173 (Tex.App.1989); Hawkland § 2–725:02, at 724–25.

Where the post-delivery testing is done by the seller, courts nevertheless have held that tender of delivery occurred when the goods were delivered. *See H. Sand & Co. v. Airtemp Corp.,* 738 F.Supp. 760, 767 (noting, in particular, that the contract neither provided for a finite period of inspection nor delineated specific testing procedures); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1455 (holding that tender of delivery occurred when the engines

were delivered, not when they were finally installed, even where the seller "had continuing responsibility for supervising the installation"); *City of Cincinnati, Ohio v. Dorr–Oliver, Inc.,* 659 F.Supp. 259, 262 (holding that tender of delivery "is not contingent upon inspection, testing, or acceptance"). *See also Ontario Hydro v. Zallea Sys., Inc.,* 569 F.Supp. 1261, 1268 (holding that the testing requirements of the contract "in *Pullman* constituted a pre-delivery inspection, while the clause in question in this case more closely resembles a post-delivery inspection"). *Cf. Baker v. DEC Int'l,* 458 Mich. 247, 255 & n. 14, 580 N.W.2d 894, 898 & n. 14 (1998) (distinguishing *H. Sand & Co., Dorr–Oliver,* and *Ontario Hydro* on the ground that "contractual provisions for postdelivery testing or inspection do not toll the accrual of breach of warranty claims," as opposed to installation).

▆ In the case before us the words, "Start up and Commissioning (8 Hr. Allowance)," the descriptions by the witnesses of the actual commissioning, and the reports or checklists of the commissioning of the three engines initially purchased by Shantytown fall far short of demonstrating a situation comparable to *Pullman.* For the purpose of limitations on implied warranties, the ordinary rule is that the four years begins to run when the goods are delivered, and the evidence in the case before us does not alter that result. Consequently, the Shantytown claims for breach of implied warranties in the sale of the three engines that were delivered before October 1, 1990, are barred by limitations.

### IV

In addition to the issue of limitations, this Court also granted the defendants' petitions for certiorari on the question of the computation of damages. We do not reach the defendants' damage computation issues because of our holding on limitations.

Shantytown had purchased in April 1994 a replacement engine for the center mounting in the O.C. Princess. Shantytown claimed at trial, and the jury apparently agreed, that the

defendants breached implied warranties in the sale of that fourth engine. Evidence was introduced as to the cost of that fourth engine, but the jury, in assessing damages, did not distinguish between the earlier and the later sales transactions. The verdict on special interrogatories generally assessed $46,691 in damages by way of lost profits and $190,-228.21 in other damages.

Moreover, the Court of Special Appeals did not decide the defendants' damages issues because it remanded for "a proper resolution" of "[m]atters such as proximate cause and intervening acts" by the buyer. Shantytown did not file any cross-petition for certiorari from that holding by the Court of Special Appeals.

Consequently, this action must be remanded to the circuit court to determine, as to the fourth engine, the issues of proximate cause and intervening act on which the Court of Special Appeals remanded, and, depending upon the resolution of those issues, to determine the damages for breach of warranty in the sale of the fourth engine.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A MANDATE REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR WORCES-TER COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR WORCESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, SHANTYTOWN PIER, INC.**

ELDRIDGE, Judge, dissenting:

The majority's analysis begins with the erroneous premise that the determination of when tender of delivery occurred in this case is a question of law. This incorrect premise leads the majority to state that "the defendants had no burden of persuading the trial court factually that accrual of the claim

was not postponed until commissioning," despite the fact that the limitations issue was raised on the defendants' motion for judgment. (Majority opinion at 624). From this, then, the majority erroneously concludes, as a matter of law, that tender of delivery occurred in this case when the engines were physically delivered to Lydia.

As an initial matter, it would be useful to delineate those points made by the majority with which I am in agreement. I agree that Maryland Code (1975, 1997 Repl.Vol.), § 2–725 of the Commercial Law Article requires a party to bring a cause of action for breach of warranty in a sale of goods context within four years from the breach of warranty. I also agree that, in a case like this, a breach of warranty occurs when tender of delivery is made, and that tender of nonconforming goods "is sufficient to trigger the statute of limitations." (Majority opinion at 627).

Furthermore, I agree with the majority that the definition of "tender of delivery" in § 2–503 and Official Comment 1 to § 2–503 provides the analytical framework within which to decide this case. Section 2–503(1) states:

> "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery."

According to Official Comment 1 to § 2–503, the term "tender of delivery" can be used in two senses, what the majority labels "a narrow and a broad" definition. (Majority opinion at 625). The first, "narrow," sense "contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed." Official Comment 1 to § 2–503, second sentence. The second, "broad," sense "is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation." *Id.*, fourth sentence.

As stated in Official Comment 1 to § 2–725, the "broad" sense of "tender of delivery" means simply that the seller has offered the goods to the buyer "as if in fulfillment" of the contract. In other words, where a seller offers the goods to the buyer in the good faith belief that they conform to the contract requirements, then the seller has tendered delivery, even if it later becomes apparent that the goods are nonconforming.[1] As Professor Hawkland has stated, in this "broader" sense "the term 'tender' is used in Article 2 of the UCC as an offer by the seller to deliver what he believes incorrectly to be conforming goods." 2 W.D. Hawkland, *Uniform Commercial Code Service,* § 2–503:2 at 931 (1994, 1998). *See also, e.g., Ontario Hydro v. Zallea Systems, Inc.,* 569 F.Supp. 1261, 1267 (D.Del.1983). It is in this sense that tender of nonconforming goods can trigger the running of the statute of limitations: where the seller offers goods in the belief that his contract obligations have thereby been fulfilled, he has tendered delivery, even if it later turns out that the goods are nonconforming.

The question then in a dispute over whether tender of delivery has occurred, is whether the seller has offered the goods to the buyer "as if in fulfillment" of the contract. Contrary to the majority's assertion that this is a legal determination, it is a factual determination involving inquiry into the terms of the contract and the reasonable beliefs of the seller. For example, it is impossible to know whether the seller believed that its delivery of the goods was in fulfillment of the contract without knowing the terms of the contract. As Professor Hawkland states (Hawkland, *Uniform Commercial Code Service, supra,* § 2–725:2 at 730 n. 2, emphasis added):

> "*It is always a question of fact, however, when tender of delivery has been completed.* This characterization is diffi-

---

**1.** Maryland Code (1975, 1997 Repl.Vol.), § 1–203 of the Commercial Law Article states as follows:

" **§ 1–203. Obligation of good faith.**

"Every contract or duty within Titles 1 through 10 of this article imposes an obligation of good faith in its performance or enforcement."

cult in situations which the seller agrees not only to deliver component parts but to assemble or install them. Usually, it is held that tender of delivery occurs when the installation or assembly is completed."

*See also, e.g., H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 456 (2d Cir.1991) (summary judgment on § 2–725 limitations grounds was improper; a material issue of fact existed as to when tender of delivery occurred); *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 378, 532 N.W.2d 541, 547 (1995) (same); *Allis–Chalmers Credit Corp. v. Herbolt,* 17 Ohio App.3d 230, 235, 479 N.E.2d 293, 300 (1984) (grant of summary judgment on statute of limitations grounds was erroneous; question of how delivery was to occur under a sales contract and when it did occur were material questions of fact); *Nation Enterprises, Inc. v. Enersyst, Inc.,* 749 F.Supp. 1506, 1513 (N.D.Ill.1990) (summary judgment on § 2–725 limitations grounds was improper where a dispute of material fact existed as to whether delivery under the contract required installation of equipment as opposed to mere physical delivery).

In this case, therefore, it was necessary to determine as a matter of fact whether, when they delivered the engines to Lydia for installation in the *O.C. Princess,* the defendants believed that they had fulfilled their contract obligations, despite the fact that the engines later proved to be nonconforming.

In light of the evidentiary record, the finding in the trial court that physical delivery to Lydia for installation did not satisfy the defendant's contract obligations, and that no tender of delivery occurred at that time, was fully warranted. This is so because the price which Shantytown agreed to pay was for more than mere physical delivery of the engines to Lydia for installation in the *O.C. Princess.* In fact, the price quotation introduced into evidence at trial by the defendants read as follows (emphasis added):

"The afore-mentioned price is a firm price and is *for delivery,*

—  FOB Pompano Beach, Florida

—  Including, shipping skid, excluding boxing

—  Including United States customs duty and customs charges

—  Excluding installation

—  Excluding any State or Local Sales Tax

—  *Including start up and commissioning (8 hour allowance) . . . .* "

Thus, the parties' agreement stated clearly and unambiguously that "delivery" included "start up and commissioning."

This is not a case where the seller merely had ongoing responsibilities such as repair and maintenance. Rather, in this case, the parties specifically stated that delivery *included* start up and commissioning. It would be difficult to conclude that the defendants in good faith believed that they had completed their delivery requirements before start up and commissioning had been done. When they delivered the engines to Lydia at Pompano Beach, they did not do so "as if in fulfillment" of the contract, because they knew that fulfillment of the contract required more for delivery—start up and commissioning.

Consequently, the instant case is exactly like *Wilke, Inc. v. Cummins Diesel Engines, Inc.*, 252 Md. 611, 250 A.2d 886 (1969), which the majority rejects. In *Wilke*, the seller was obligated to deliver, install and test a diesel generator in compliance with certain specifications. The seller delivered the generator before the job site was ready for the installation, and the generator was damaged by the elements while awaiting installation. The question in that case was whether, under § 2–510(1), the risk of loss had shifted to the buyer when the generator was physically delivered, or remained in the seller until installation and testing.[2] This Court concluded that the risk of loss remained with the seller because "the

---

**2.** Section 2–510(1) states that "[w]here a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."

delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract." 252 Md. at 618, 250 A.2d at 890.

The majority states that *Wilke* is irrelevant to the instant case because § 2–510(1), under which *Wilke* was decided, "applied the narrow definition of 'tender of delivery.'" (Majority opinion at 628). Yet, the majority also states that "[u]nder the facts in *Wilke* there was no tender of delivery in either the narrow *or the broad sense*. The goods were not conforming and the seller did not make 'an offer of goods ... under a contract as if in fulfillment of its conditions....'" (*Ibid.*, emphasis added). I agree with this statement. But, I fail to understand how the majority reaches the conclusion that the facts in *Wilke* did not meet the broad definition of "tender of delivery" but that the facts in the instant case do.

Obviously, the majority does not mean to say that the seller in *Wilke* did not satisfy the broad definition of "tender of delivery" because the goods were nonconforming, since the tender of nonconforming goods is sufficient to satisfy the broad definition. The majority, then, apparently means that the seller in *Wilke* did not meet the broad definition of "tender of delivery" because the seller's delivery obligations under the contract required more than mere physical delivery—it also required installation and testing. That is, the seller in *Wilke* could not have made a tender of delivery under the broad definition (tender of goods "as if in fulfillment of the contract") because the seller knew that fulfillment of the contract required more than mere physical delivery. As this Court pointed out (*Wilke*, 252 Md. at 617, 250 A.2d at 890):

"The narrow issue here is, whether Cummins made a 'delivery' of goods which conformed to the contract. It will be recalled that Wilke's purchase order specifically incorporated the government specifications, which consisted of two and a half pages of single-spaced typescript which detailed the field tests to be performed prior to acceptance by the government.... [T]hese tests were not intended to be an empty ritual...."

The instant case presents facts substantially similar to those in *Wilke*, which the majority concedes did not even satisfy the broad definition of "tender of delivery." In the instant case, as previously pointed out, the purchase order required the seller to complete start up and commissioning as part of its delivery obligations. Like the testing required in *Wilke*, this commissioning process was "not intended to be an empty ritual." *Ibid.* Rather, like the testing in *Wilke*, which involved operating the generator at various load rates and the "hourly recording of data during the field tests," *ibid.*, the commissioning in this case involved "put[ting] a variety of monitoring equipment on the engines in the engine room itself to monitor operating temperatures, pressures, exhaust temperatures, engine room depression, and record[ing] the values at a variety of speeds, including wide-open throttle." (Majority opinion at 621). Thus, like the mere physical delivery in *Wilke*, the mere physical delivery in this case did not satisfy even the broad definition of "tender of delivery."

The majority's treatment of *In re Automated Bookbinding Servs., Inc.*, 336 F.Supp. 1128 (D.Md.), *rev'd on other grounds*, 471 F.2d 546 (4th Cir.1972), is similarly flawed. In that case the buyer had purchased a bookbinding machine under a contract which required the seller to "provide and install specified equipment, place it in first class running order, and train an operator." 336 F.Supp. at 1134. The federal district court stated that "[u]nder these facts ... [the seller] was in no position to tender delivery under its agreement until the equipment had been assembled, placed in first class running order, and an employee of [the buyer] had been trained as an operator." *Ibid.* The majority apparently agrees with this analysis when it states that "[i]t is apparent that the seller in the *Automated Bookbinding* case had not tendered goods 'as if in fulfillment of' the contract's conditions." (Majority opinion at 628–629). Yet, the majority makes no attempt to distinguish the facts of that case from those of the instant case. If it is apparent that the seller in *Automated Bookbinding* had not tendered goods as if in fulfillment of the contract, then it is equally apparent that the seller in the instant case

did not tender goods as if in fulfillment of the contract either. The defendants in this case were in no position to tender delivery under their agreement until the start up and commissioning of the engines was completed.

Similar results have been reached by other courts in cases where a seller's delivery obligations include more than mere physical delivery, such as installation, set-up and testing. Indeed, the majority acknowledges that "[t]here is case law which stands for the proposition that the clock in § 2–725 does not begin to run until after the goods have been installed, where, under the contract, the seller is expressly obligated to install." (Majority opinion at 630).

These cases, some of which involve obligations by the seller in addition to installation, represent the general rule. *See, e.g., Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813, 819 (6th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979) (cause of action under § 2–725 accrues upon initial installation of product); *Val Decker Packing Co. v. Corn Products Sales Co.,* 411 F.2d 850, 851 (6th Cir.1969) (sale of storage facilities to a food processing plant; cause of action accrued on the date when installation was completed); *Dowling v. Southwestern Porcelain, Inc.,* 237 Kan. 536, 544, 701 P.2d 954, 960 (1985) (in a sale of a grain silo, tender of delivery giving rise to the cause of action for breach of warranty under § 2–725 did not occur upon delivery of the component parts but only upon the completion of the installation; the court pointed out that it would only be then that the silo could be tested for proper functioning); *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 221, 531 P.2d 41, 47 (1975) (in the sale of accounting machines, tender of delivery giving rise to a cause of action for breach of warranty under § 2–725 did not occur until installation of the machines was complete); *City of Willmar v. Short–Elliott–Hendrickson, Inc.,* 475 N.W.2d 73, 81 (Minn.1991) (delivery of component parts to be incorporated into a larger waste-water system did not constitute tender of delivery for purposes of § 2–725; tender of delivery occurred when parts were installed and initially tested); *Dreier Co., Inc. v. Unitronix Corp.,*

218 N.J.Super. 260, 270, 527 A.2d 875, 881 (1986) (in the sale of a computer system, tender of delivery included not only physical delivery of the hardware components but also customized installation of software so that the system could be evaluated); *Shero v. Home Show U.S.A., Ltd.*, 193 A.D.2d 1072, 598 N.Y.S.2d 408 (1993) (sale of a solar heating unit; the cause of action for breach of warranty accrued on the date when installation was complete); *Unitron Graphics, Inc. v. Mergenthaler Linotype Co.*, 75 A.D.2d 783, 428 N.Y.S.2d 243 (1980) (tender of delivery of equipment for § 2–725 purposes occurred not upon physical delivery but only upon installation); *Jandreau v. Sheesley Plumbing & Heating Co., Inc.*, 324 N.W.2d 266, 270 (S.D.1982) (where the contract for sale of an irrigation system included installation of the equipment, tender of delivery under § 2–725 did not occur until installation); *Memorial Hospital v. Carrier Corp.*, 844 F.Supp. 712, 716 (D.Kan.1994) ("[w]here the goods are to be installed by the seller, [§ 2–725] statute of limitations does not begin to run until the installation is complete"); *St. Anne–Nackawic Pulp Co. v. Research–Cottrell, Inc.*, 788 F.Supp. 729, 736–737 (S.D.N.Y.1992) (contract for sale of pollution-control system provided for the testing of the system after installation; tender of delivery did not occur upon physical delivery but only upon completion of the testing as called for by the contract); *Westinghouse Elec. Corp. v. Carolina Power & Light Co.*, 1990 WL 107428 (W.D.Pa.1990) (unreported) (sale of steam generators for use in a nuclear power plant; tender of delivery under § 2–725 occurred at the time of installation where the seller was responsible for installation under the sales contract); Hawkland, *Uniform Commercial Code Service, supra,* § 2–725:2, at 730 n. 2. *Cf. Binkley Co. v. Teledyne Mid–America Corp.*, 333 F.Supp. 1183, 1187 (E.D.Mo.1971), *aff'd,* 460 F.2d 276 (8th Cir.1972) (where a contract for the sale of a spot welding machine did not require the seller to set up or install the machine, tender of delivery under § 2–725 occurred when the machine was physically delivered).

The majority cites one case for a contrary position, *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646

F.Supp. 1442 (S.D.N.Y.1986). That case, however, does not stand for the proposition that tender of delivery always occurs upon physical delivery of goods. Rather, the court there stated that "[i]n *this case,* 'tender' coincided with actual delivery," and the court specifically relied on the fact that the "contract contained no provision that the goods be tested to assure conformance with the contract before delivery was complete." 646 F.Supp. at 1455 (emphasis added). Thus, *Long Island Lighting Co.* is not inconsistent with the above-cited cases which stand for the proposition that, when a seller specifically undertakes to install or test goods as part of its delivery obligations, then tender of delivery does not occur until the installation or testing is complete.

Faced with an arsenal of contrary authority, the majority attempts to distinguish the instant case by stating that "[i]n any event, in the case before us, Shantytown [sic] contracted to sell engines—not to sell engines and to install them." (Majority opinion at 631). As noted earlier, however, the majority ignores the fact that Shantytown contracted to buy engines and for their "delivery, ... including start up and commissioning." This language makes it clear that the defendants in this case undertook start up and commissioning as part of their delivery obligations. As indicated previously, several of the above-cited cases involved similar testing. The critical point is not whether the seller's obligation involved installation; it is whether the seller's obligation involved something more than physical delivery. In the case at bar, the seller's obligation did involve something more. No tender of delivery occurred until the start up and commissioning were complete.

The majority's attempts to distinguish other cases cited by Shantytown are similarly unconvincing. Specifically, the majority rejects Shantytown's reliance on *City of New York v. Pullman, Inc.,* 662 F.2d 910 (2d Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). In that case the City of New York contracted with Pullman for the purchase of 754 subway cars, with an initial shipment of ten cars for a testing and inspection period. The United States Court

of Appeals held that "tender of delivery could not occur, and did not occur, until the required test of the sample train was completed...." 662 F.2d at 919. The majority states that "[t]he rationale of *Pullman* is not transferable to the sales transaction before us." (Majority opinion at 632). This is so, according to the majority, because (*id.* at 632–633)

> "under the terms of the *Pullman* contract, the city and its transit authority were not obliged to take any steps by way of performance until the ten test cars, by the testing process, had been found to conform to the contract. Stated another way, the *Pullman* contract negated the possibility that the delivery of nonconforming goods could be tender of delivery. The *Pullman* contract blocked the possibility of applying the broader meaning of tender of delivery...."

This analysis is incorrect. *Pullman,* is nothing more than a straight-forward application of the broader meaning of "tender of delivery," which is that tender of delivery occurs when the seller offers goods "as if in fulfillment of the contract." Obviously, when Pullman delivered the first ten cars for testing, they were not offering goods as if in fulfillment of the contract because the contract required more than mere physical delivery of ten cars. With regard to the broad interpretation of "tender of delivery," *Pullman,* like the cases cited above, is indistinguishable from the instant case. All of those cases, like the instant case, involve contracts which required more than mere physical delivery on the part of the seller.

This is also true of *St. Anne–Nackawic Pulp Co. v. Research–Cottrell, Inc., supra,* 788 F.Supp. 729, relied on by Shantytown, but which the majority dismisses. In that case the buyer purchased a $2 million pollution control system for its wood pulp plant. The contract of sale included both installation and performance/testing requirements. *Id.* at 731. The system was installed but never achieved the required performance levels, and the buyer sued. The buyer's suit was within four years of the final tests but not within four years of the installation. The seller moved for summary judgment on § 2–725 limitations grounds. The court rejected the seller's limitations argument, reasoning that tender of delivery had

occurred not when the system was installed, but when the testing was completed, because, as long as testing continued, the seller was "still performing under the Contract." *Id.* at 736. The federal court in *St. Anne–Nackawic* recognized that (*Id.* at 734–735)

> "[a]lthough tender of delivery usually occurs when the seller physically delivers the goods, parties may alter by contract how or when tender of delivery occurs.... [D]efendant's conclusion merely begs the question, which is when the parties intended delivery to occur."

Like *Pullman, supra,* and the other cases cited earlier, *St. Anne–Nackawic* is merely an example of a contract where it was impossible for physical delivery by the seller to constitute tender of goods "as if in fulfillment of" the contract because the contract required more. Again, this is indistinguishable from the situation presented by the instant case, because the contract required more than mere physical delivery. It required start up and commissioning.

The majority seeks support for its position by stating that "[f]ederal district courts, including those in the Second Circuit, have not read *Pullman* as an invitation to postpone the accrual of limitations under U.C.C. § 2–725 beyond actual delivery." (Majority opinion at 634). As an example, the majority cites *H. Sand & Co., Inc. v. Airtemp Corp.,* 738 F.Supp. 760, 766 (S.D.N.Y.1990), *aff'd in part, rev'd in part,* 934 F.2d 450 (2d Cir.1991). The *Airtemp* case involved a contract for the sale of four chillers to be used as part of a cooling system. All four of the chillers were shipped from the seller to the buyer's agent, although only three of them had been tested as apparently required by the contract. The fourth chiller had not been tested because the seller was relocating its plant and the fourth chiller was completed after the seller had disconnected its testing equipment. Subsequently, after the seller's relocation was completed, the fourth chiller was shipped back to the seller at the seller's expense for testing, and was returned to the buyer. More than four years after the initial shipment of the four chillers, but less than four years after the second shipment of the fourth chiller,

the buyer sued the seller for breach of warranty. The seller moved for summary judgment on § 2–725 grounds, arguing that tender of delivery had occurred on the date of initial shipment of the chillers. The buyer argued that tender of delivery occurred only upon the second shipment of the fourth chiller.

The district court in the *Airtemp* case agreed with the seller, distinguishing *Pullman, supra,* stating that "the *Pullman* holding is based upon a rare and distinctive set of facts and thus we must be restrictive in our application of its rulings," 738 F.Supp. at 766, and that "the inspection provision contained in [the] purchase order does not postpone tender of delivery (unlike the finding in *Pullman) . . . ." Id.* at 767. The majority seizes upon this apparent rebellion, on the part of a federal district court in the Second Circuit, against the United States Court of Appeals for the Second Circuit, as an indication that *Pullman* is a disfavored opinion. (Majority opinion at 634). Undermining the majority's position, however is the fact that the United States Court of Appeals for the Second Circuit *reversed* the district court on the very issue of tender of delivery. *H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 455–456 (2d Cir.1991). Specifically, the United States Court of Appeals reaffirmed *Pullman,* stating that "parties may by contract agree that delivery will not be made until some form of testing has been completed." *Id.* at 455. The federal Court of Appeals looked to two letters and a memo written by various buyer and seller employees regarding the shipment and storage of the fourth chiller until such time as it could be tested, and noted that "[t]hese three documents would allow a reasonable jury to conclude [the buyer] was holding the chiller for [the seller's] convenience and at [the seller's] disposition, not [the buyer's]." *Id.* at 454. Thus, the Court of Appeals concluded that summary judgment was improper "[b]ecause there [was] a genuine issue of material fact as to whether the [first] shipment of chiller # 4 constituted tender of delivery for purposes of the accrual of [the buyer's] cause of action." *Id.* at 456. Consequently, whatever support the majority finds in the district court's

reasoning was erased on appeal. The district court's reasoning, including its restrictive application of *Pullman, supra,* was flatly rejected by the Court of Appeals.

The other trial court cases cited by the majority also do not support the majority's position. For example, the cases of *Cincinnati, Ohio v. Dorr–Oliver, Inc.,* 659 F.Supp. 259, 262–264 (D.Conn.1986), and *Raymond–Dravo–Langenfelder v. Microdot, Inc.,* 425 F.Supp. 614, 617–618 (D.Del.1976), both involved arguments by the buyer that the cause of action did not accrue until the buyer accepted the goods. I agree with those cases' rejection of that argument. The cause of action accrues when the breach occurs. The breach occurs when tender of delivery is made. Tender of delivery is not contingent upon acceptance by the buyer. Rather tender of delivery occurs when the "seller put[s] and hold[s] conforming goods at the buyer's disposition," § 2–503, that is when the seller offers goods "as if in fulfillment of the contract." Obviously, the seller's ability to put goods at the buyer's disposition as if in fulfillment of the contract is in no way dependent upon the buyer's acceptance of those goods.

The majority's reliance on *Ontario Hydro v. Zallea Systems, Inc.,* 569 F.Supp. 1261 (D.Del.1983), is similarly misplaced. That case involved a contract for the sale of goods which provided for the inspection of the goods by the buyer prior to acceptance. When a § 2–725 limitations issue was raised, the court there held that tender of delivery occurred at physical delivery, not after the buyer's inspection. The court reasoned that "the inspection clause was not directed to the tender of delivery aspect but rather to ... [the buyer's] right to reject the goods once they were delivered, for the clause focuses not on delivery but on the preservation of [the buyer's] right to reject after full delivery." *Id.* at 1268. Again, while the *Ontario Hydro* court may have reached a proper result, that case simply does not speak to the instant case. Obviously, as mentioned above, actions taken by the *buyer* have nothing to do with the *seller's* tender of delivery. The case at bar, however, presents a situation involving certain actions specifically included in the seller's delivery obligations.

Finally, as a procedural matter, I believe that the Court of Special Appeals correctly affirmed the trial court. The defendants' argument on appeal is that "the trial court erred in denying petitioners' motion for judgment on the basis of limitations." (Petitioners' brief in this Court at 8). In ruling on the defendants' motion for judgment, the trial court was required to view the evidence in the light most favorable to Shantytown, the non-moving party, and then to consider whether, as a matter of law, judgment should be entered for the moving party, the defendants. *De Bleecker v. Montgomery County,* 292 Md. 498, 510, 438 A.2d 1348, 1355 (1982). *See also, e.g., Smith v. Aulick,* 252 Md. 268, 270, 250 A.2d 534, 535 (1969). The majority errs in concluding that "the defendants had no burden of persuading the trial court factually that accrual of the claim was not postponed until commissioning." (Majority opinion at 624). As the Court of Special Appeals properly held, the defendants had the burden of proving that Shantytown's action was time-barred, including proving when tender of delivery was made. *See, e.g., Latham & Assoc's, Inc. v. William Raveis Real Estate, Inc.,* 218 Conn. 297, 303–304, 589 A.2d 337, 340–341 (1991) (in presenting an affirmative defense on § 2–725 limitations grounds, the seller had the burden of proving the buyer's noncompliance with § 2–725; thus, the seller was also required to prove the date on which tender of delivery was made). The defendants logically could prevail on their motion only if they could show: either (1) that tender of delivery, as a matter of law, always coincides with physical delivery of the goods, or (2) if tender of delivery can be at a time other than physical delivery, that even viewing the facts in the light most favorable to Shantytown, the evidence conclusively demonstrates that tender of delivery in this case occurred upon physical delivery.

As shown by the previously discussed cases, it is clear that tender of delivery does not always coincide with physical delivery as a matter of law. Rather, it is a factual determination that must be made with reference to the agreement and actions of the contracting parties. Therefore, the defendants could not make the first showing set forth above.

Furthermore, the defendants also could not make the second showing. Viewing the facts in the light most favorable to Shantytown, it cannot reasonably be said that the Court of Special Appeals erred in affirming the trial court's determination that tender of delivery in this case occurred not when the engines where physically delivered to Lydia for assembly, but when they were finally commissioned. As discussed above, the only evidence pertinent to the tender of delivery issue admitted at the trial was the price quotation which stated clearly and unambiguously that the seller's delivery obligation included start up and commissioning.

Thus, in my opinion, the trial court correctly denied the motion for judgment. A trial court grant of the defendant's motion for judgment would have been erroneous because the only evidence introduced at trial pertinent to the tender of delivery issue showed that tender of delivery occurred at commissioning, not at physical delivery. As this Court stated in *Impala Platinum v. Impala Sales*, 283 Md. 296, 328, 389 A.2d 887, 906 (1978) "[i]f there is any legally relevant and competent evidence ... from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict." The Shantytown claims for breach of implied warranties were not barred by limitations. Therefore, I dissent.

Judges RAKER and WILNER have authorized me to state that they concur with the views expressed herein and join this opinion.